**HAZELTINE CORPORATION**

v.

**UNITED STATES.**

No. 303–54.

United States Court of Claims.
Feb. 11, 1959.

William M. Emery, Chicago, Ill., for plaintiff. Leonard S. Schmitz, Chicago, Ill., was on the brief.

Harold S. Larsen, Washington, D. C., with whom was Asst. Atty. Gen. Charles K. Rice, for defendant. Lyle M. Turner and James P. Garland, Washington, D. C., were on the briefs.

PER CURIAM.

This is an action by plaintiff to recover overpayments of income taxes and interest based upon losses alleged to have been sustained upon the abandonment of certain trade-marks in either 1943, 1944, or 1945.

The case was referred to Mastin G. White, a trial commissioner of the court, with directions to make findings of fact and recommendations for conclusions of law which he has done in his report filed June 26, 1958. The court after having considered the evidence, the briefs and argument of counsel agrees with the findings and conclusions reached by the trial commissioner as hereinafter set forth. They are hereby adopted and made the basis of the court's judgment in this case. Plaintiff is therefore entitled to recover, together with interest, as provided by law, and judgment is entered to that effect. The amount of recovery will be determined pursuant to Rule 38(c), 28 U.S.C.

It is so ordered.

Opinion of the Commissioner

WHITE, Commissioner.

This suit arose because of the action of the Commissioner of Internal Revenue in rejecting alternative claims for refund filed by the plaintiff on the theory that it had overpaid its income tax for 1943 or 1944 or 1945. The plaintiff asserted before the Commissioner of Internal Revenue—and it asserts in the present litigation—that it was entitled, in computing its taxable income for one of the three years mentioned, to take a deduction because of a loss in the amount of $244,375, representing the cost to the.

plaintiff of three trade-marks which it had acquired in February 1924.

The defendant apparently concedes that the cost of the three trade-marks [1] was deductible as a loss for income tax purposes at an appropriate time, but the defendant contends that the proper time for the taking of such a deduction occurred prior to 1943, and, accordingly, that the plaintiff waited too long to assert its right in this respect.

The three trade-marks referred to above consisted of the names "Neutrodyne," "Neutroformer," and "Neutrodon." They were acquired by the plaintiff, along with other assets, in February 1924 by assignment from the Hazeltine Research Corporation.

The most inportant of the assets acquired by the plaintiff from the Hazeltine Research Corporation in February 1924 were four inventions that had been made by Professor Louis A. Hazeltine, in an effort to eliminate the oscillations, and the resulting squeals, whistles, and howls, which characterized radio reception in the early days of the radio industry. Professor Hazeltine's study and work resulted in several inventions covering a neutralization method for eliminating the trouble previously mentioned, and also covering a radio receiver incorporating such method. A paper describing these inventions (which will usually be referred to in this opinion as the "neutralization inventions") was read by Professor Hazeltine before a meeting of the Radio Club of America at Columbia University in March 1923. A model of a radio receiver utilizing such inventions was also demonstrated at the same meeting. The production of this type of receiver on a commercial scale by manufacturers holding licenses for the use of the neutralization inventions was begun a few months thereafter, and it soon found wide public acceptance.

As of February 1924, when the ownership of the neutralization inventions was acquired by the plaintiff, one of these inventions—the basic invention—was covered by a patent which had been issued on March 27, 1923; and two of these inventions were covered by applications for patents, which subsequently resulted in the issuance of a second patent on April 1, 1924 and a third patent on April 14, 1925. There was a fourth invention in the neutralization group as of February 1924; and a patent application relative to this invention was filed on April 7, 1924, resulting in the issuance of a fourth patent on March 16, 1926.

The trade-marks Neutrodyne, Neutroformer, and Neutrodon had been registered by the Patent Office on August 21, 1923, prior to their acquisition by the plaintiff in February 1924. The trademark Neutrodyne was registered "for radio receiving sets," and it was used to refer to receiving sets embodying the neutralization inventions. The trademark Neutroformer was registered "for electrical transformers"; the trade-mark Neutrodon was registered "for electrical condensers"; and both of these trademarks were used to refer to components of the type of radio receiving set embodying the neutralization inventions.

By the time when the plaintiff acquired the ownership of the neutralization inventions and the three trademarks in February 1924, the public demand for the type of radio receiver utilizing such inventions was so great that the manufacturers of the receivers were able to sell all that they could produce. At that time, and for several years thereafter, the licenses that authorized the use of the plaintiff's neutralization inventions also granted to the licensees the right to use the trade-marks Neutrodyne, Neutroformer, and Neutrodon. Such licenses required that radio receiving sets manufactured through the use of the neutralization inventions be advertised and marked as Neutrodyne sets.

---

[1]. The defendant says that the evidence in the present case does not show the actual amount of such cost. It is found as a fact, however, that the cost of the trademarks amounted to $244,375. (See finding 5(d).)

The public demand for and the production of radio receivers utilizing the neutralization inventions continued to grow until 1928, when a peak was reached. Thereafter, this type of receiver began to be superseded by receivers utilizing a device known as the screen grid tube. By 1930, the neutralization type of receiver was obsolete, and no such receivers were manufactured after that year. No licenses authorizing the use of the neutralization inventions, apart from other inventions, were issued after 1930.

The popularity of the trade-marks Neutrodyne, Neutroformer, and Neutrodon, and their use for advertising and marking radio receiving sets manufactured by persons holding licenses for the use of the plaintiff's neutralization inventions, waxed and waned along with the popularity of the neutralization type of receiving set. These trade-marks were not used subsequent to 1930.

After the neutralization type of radio receiving set became obsolete in 1930, the plaintiff discontinued the issuance of licenses that related solely to the use of the neutralization inventions and the trade-marks Neutrodyne, Neutroformer, and Neutrodon. However, the plaintiff, in addition to the ownership of the neutralization inventions, owned other inventions that were useful in the radio field. After 1930, the plaintiff continued in the business of issuing licenses authorizing the use of inventions owned by it, and collecting fees for such use. Beginning in about 1932, the licenses issued by the plaintiff customarily granted the right to use all of its inventions, including the neutralization inventions, although the latter were not actually used after 1930. These blanket licenses did not refer specifically to the use of the trade-marks Neutrodyne, Neutroformer, and Neutrodon.

Although the trade-marks Neutrodyne, Neutroformer, and Neutrodon were not actually used by the plaintiff or its licensees after 1930, the plaintiff's books and records continued to show the trade-marks as an asset until 1944.

In February 1943, the prospective expiration of the Federal registrations of the trade-marks Neutrodyne, Neutroformer, and Neutrodon was considered by the plaintiff's board of directors, which adopted the following resolution:

"*Resolved,* that (1) the trade-marks Neutrodyne, Neutroformer and Neutrodon be not re-registered in the U. S. Patent Office but that said registrations be allowed to expire and (2) that this corporation abandon the said trademarks, surrender the same and renounce the exclusive right or privilege to use or employ the same in its business."

The plaintiff permitted the registrations of the three trade-marks to expire in August 1943, but it did nothing further during 1943 by way of abandoning the trade-marks.

At a meeting of the plaintiff's board of directors held on December 13, 1944, the following resolutions were adopted:

"*Resolved,* that the corporation abandon both the said registration of said trademarks and the said trademarks and any and all right, exclusive or otherwise, arising from the said registration and trademarks at common law and further

"*Resolved,* that the officers be and hereby are instructed to reflect in the accounts the abandonment of the trademarks by writing off the amount [$244,375] at which such trademarks are reflected in the accounts."

Appropriate adjustments were subsequently made in the plaintiff's books of account pursuant to the instruction contained in the second of the two resolutions quoted in this paragraph.

On February 15, 1945, the plaintiff's board of directors adopted a further resolution which approved the charging of the loss on the trade-marks in the amount of $244,375 against earnings for 1944.

In the March 28, 1945 issue of Radio and Television Weekly, the plaintiff published an announcement giving notice

that "as of and from December 1, 1944," it had abandoned the trade-marks Neutrodyne, Neutroformer, and Neutrodon and had "dedicated said trademarks and trade names and all rights thereunder to the public."

There is apparent agreement between the plaintiff and the defendant that under Section 23(f) of the Internal Revenue Code of 1939 (26 U.S.C., 1952 ed., 23(f)) the plaintiff was entitled, in computing its net income for the taxable year during which it sustained a loss on the three trade-marks previously mentioned, to take a deduction in an amount representing the cost of the trade-marks to the plaintiff.[2] The principal problem in the case, therefore, is to determine in what year the loss on the trade-marks occurred.

■ Before a taxpayer can take a capital loss deduction for income tax purposes, the capital asset must be completely liquidated by disposing of it or permanently abandoning it as worthless. United States v. Huntington Laboratories, 7 Cir., 1936, 82 F.2d 356, 357; Reporter Pub. Co. v. Commissioner of Internal Revenue, 10 Cir., 1953, 201 F.2d 743, 744, 745, certiorari denied 345 U.S. 993, 73 S.Ct. 1133, 97 L.Ed. 1401. With regard to the three trade-marks involved in the present litigation, the plaintiff says that it abandoned the trade-marks in 1943 or 1944 or 1945, whereas the defendant contends that the plaintiff abandoned these trade-marks prior to 1943.

The defendant's basic contention on the subject of abandonment is that the trade-marks Neutrodyne, Neutroformer, and Neutrodon were actually abandoned sometime in 1930, when the plaintiff's licensees stopped using the trade-marks in advertising and marking radio receiving sets, and when the plaintiff stopped issuing licenses which expressly authorized the use of these trade-marks. It has been held by the courts, however, that mere non-use of a trade-mark is not enough to establish abandonment. Beech-Nut Packing Co. v. P. Lorillard Co., 1927,

273 U.S. 629, 632, 47 S.Ct. 481, 71 L.Ed. 810; Application of Brockway Glass Co., 1946, 154 F.2d 673, 675, 33 CCPA 969; W. B. Davis & Son, Inc. v. Commissioner of Internal Revenue, 1945, 5 T.C. 1195, 1219. Although the public demand for a particular product previously associated with a trade-mark disappears, the owner of the trade-mark can still retain it with the possibility of using it again upon another product of the same class. Beech-Nut Co. v. P. Lorillard Co., supra, 273 U.S. at page 632, 47 S.Ct. at page 482. In the present case, therefore, although the public demand for the particular radio receiving sets, transformers, and condensers with which the respective trade-marks Neutrodyne, Neutroformer, and Neutrodon had been associated for several years vanished in 1930, the plaintiff had the right to retain these trade-marks on the possibility that it might seem feasible at a later time to utilize them again in connection with other radio receiving sets, transformers, and condensers.

■■ The abandonment of an asset involves an actual intent on the part of the owner to abandon it, plus an act or acts by the owner designed to carry out such intention. Saxlehner v. Eisner & Mendelson Co., 1900, 179 U.S. 19, 31, 21 S.Ct. 7, 45 L.Ed. 60. The element of intent is especially important in considering whether there has been an abandonment. Nieman v. Plough Chemical Co., 6 Cir., 1927, 22 F.2d 73, 76, certiorari denied 277 U.S. 603, 48 S.Ct. 563, 72 L.Ed. 1010. Whether there was an intention to abandon and an act or acts of abandonment in a particular case must be ascertained from all the pertinent facts. W. B. Davis & Son, Inc. v. Commissioner of Internal Revenue, supra, 5 T.C. at page 1219.

■ It is my opinion that the facts of the present case do not show either an intention to abandon or an act of abandonment of the trade-marks Neutrodyne, Neutroformer, and Neutrodon prior to 1943. On the contrary, the conduct

2. See footnote 1.

of the plaintiff in consistently showing these trade-marks as assets on its books and records prior to 1943 tends to establish the lack of any intention by the plaintiff to abandon the trade-marks during the pre-1943 period. W. B. Davis & Son, Inc. v. Commissioner of Internal Revenue, supra, 5 T.C. at page 1219.

██ In this connection, the defendant makes a supplementary argument to the effect that, at the latest, the trade-marks Neutrodyne, Neutroformer, and Neutrodon were abandoned in 1940, when the patent on the basic neutralization invention expired. It is true that in a situation where a name constituting a trade-mark has been used for a long period of time to describe a particular patented article and, as a result of such use, has become the generic designation of the article, the generic designation passes into the public domain upon the expiration of the patent. In other words, on the expiration of the patent in such a situation, the public has the right to make the patented article and to use its generic name. Singer Manufacturing Co. v. June Manufacturing Co., 1896, 163 U.S. 169, 185, 186, 16 S.Ct. 1002, 41 L. Ed. 118. However, the names Neutrodyne, Neutroformer, and Neutrodon had not become generic designations of articles at the time when the basic neutralization patent expired in 1940. Even as late as 1955, the names Neutroformer and Neutrodon did not appear in Webster's New International Dictionary (unabridged, 2d ed., 1955), and the name Neutrodyne appeared only as a proper noun, being defined as "A trade-mark for radio receiving apparatus * * *." Therefore, the expiration of the basic neutralization patent did not cause the trade-marks that had been associated with products manufactured under that patent and related patents to become public property. Searchlight Gas Co. v. Prest-O-Lite Co., 7 Cir., 1914, 215 F. 692, 696.

Coming now to the year 1943, it has been noted previously that the plaintiff's board of directors adopted a resolution in February of that year declaring that the trade-marks Neutrodyne, Neutroformer, and Neutrodon would not be re-registered, but would be abandoned. This resolution clearly indicated that, as of February 1943, the plaintiff had the intention to abandon the three trade-marks. However, nothing was done during the remainder of 1943 to complete the abandonment by means of an identifiable action to that end.

██ The fact that the plaintiff permitted the registrations to expire in August 1943 was not such an identifiable event as to complete the abandonment, since the plaintiff's ownership of the trade-marks was not based upon the registrations under the Federal Trade-Mark Act (15 U.S.C., 1952 ed., § 1051 et seq.), but existed independently of such act. Phillips v. Hudnut, 1920, 49 App.D.C. 247, 263 F. 643, 644; In re Plymouth Motor Corporation, 1931, 46 F.2d 211, 212, 18 CCPA 838. The actual ownership of the trademarks was based upon priority of use by the plaintiff and its predecessors in title, and their licensees. Trade-Mark Cases, 1879, 100 U.S. 82, 94, 25 L.Ed. 550; Campbell Soup Co. v. Armour & Co., 3 Cir., 1949, 175 F.2d 795, 797, certiorari denied 338 U.S. 847, 70 S.Ct. 88, 94 L.Ed. 518. The trade-mark registrations in the Patent Office merely constituted prima facie evidence that the plaintiff was the owner of the three trade-marks and was entitled to use them in interstate and foreign commerce. Phillips v. Hudnut, supra, 263 F. at page 644.

It must be concluded, therefore, that the abandonment of the three trade-marks was not effected by the plaintiff in 1943, because of the lack of an identifiable act of abandonment during that year.

██ I believe, however, that the abandonment of the trade-marks Neutrodyne, Neutroformer, and Neutrodon was completed by the plaintiff in 1944. In that year, the plaintiff's board of directors again adopted a resolution for the abandonment of the three trade-marks; and this time the board implemented the

abandonment resolution by specifically instructing the officers of the company to make adjustments in the plaintiff's accounts to reflect the abandonment of the trade-marks. Appropriate adjustments in the plaintiff's books of account were made pursuant to the board's directive. Later, the plaintiff issued a public announcement declaring that the three trade-marks had been abandoned "as of and from December 1, 1944"; and in preparing its income tax return for 1944, the plaintiff took a deduction because of the loss on the three trade-marks. These actions point to the effective abandonment of the trade-marks during 1944.

It is my opinion, therefore, that the plaintiff properly deducted the cost of the trade-marks as a loss in preparing its income tax return for 1944, and that the Commissioner of Internal Revenue should not have assessed a deficiency against the plaintiff because of such deduction.

It necessarily follows that the plaintiff is entitled to recover in the present suit, since one of its alternative claims is based upon the theory that the trade-marks were abandoned in the year 1944. The amount of recovery may appropriately be left for further proceedings under Rule 38(c).

Findings of Fact

1. The plaintiff was organized under the laws of the State of Delaware on January 29, 1924. Its principal office and place of business are located in Little Neck, Long Island, New York.

2. The plaintiff keeps its books and records, and files its Federal income tax returns, on the accrual basis of accounting, and on the basis of calendar years.

3. From the time of its incorporation in 1924 and continuing at least through 1945 (the last year that is significant from the standpoint of the present litigation), the plaintiff's principal business was the acquisition, by development or otherwise of inventions (including patents and applications for patents) useful in the radio field and in allied or related electronics fields, the licensing of manufacturers to use such inventions in producing radio or other products for sale, and the collection of royalties or other fees for such use.

4. The plaintiff began its operations with the acquisition in February 1924 of certain assets through assignments from the Hazeltine Research Corporation and from Willis H. Taylor, Jr. The assets acquired from the Hazeltine Research Corporation consisted of four radio neutralization inventions that had been made by Professor Louis A. Hazeltine in connection with the problem of radio reception, of other inventions by Professor Hazeltine pertaining to the field of radio, of three trade-marks, of a contract with the Independent Radio Manufacturers, Inc., of a contract of employment with Professor Hazeltine, of a contract of employment with Harold A. Wheeler, and of any goodwill of the Hazeltine Research Corporation associated with these assets. The acquisition from Willis H. Taylor, Jr., consisted of the so-called Dreyer invention, which related to and was useful in connection with the neutralization inventions of Professor Hazeltine.

5. (a) The total cost of the assets acquired by the plaintiff in February 1924 (see finding 4) amounted to $2,443,750.

(b) Of the total amount mentioned in paragraph (a) of this finding, 75 percent of such amount, or $1,832,812.50, represented the cost of the inventions, and 25 percent, or $610,937.50, represented the cost of the assets other than inventions.

(c) With regard to the sum of $1,832,812.50 representing the cost of the inventions, 85 percent of this amount, or $1,557,890.63, was properly allocable to the neutralization inventions.

(d) With regard to the amount of $610,937.50 representing the cost of the assets other than inventions, 50 percent, or $305,468.75, was properly allocable to the contract with the Independent Radio Manufacturers, Inc., 40 percent, or $244,375, was properly allocable to the three trade-marks, and 10 percent, or $61,093.75, was properly allocable to the

employment contracts with Professor Hazeltine and Harold A. Wheeler. None of this amount was properly allocable to goodwill as a separate asset.

6. (a) The neutralization inventions referred to in finding 4 had been developed by Professor Hazeltine in an effort to eliminate the oscillations, and the resulting squeals, whistles, and howls, which characterized radio reception in the early days of the radio industry. Professor Hazeltine's study and work resulted in several inventions covering a neutralization method for eliminating the trouble previously mentioned, and also covering a radio receiver incorporating such method. A paper describing these inventions was read by Professor Hazeltine before a meeting of the Radio Club of America at Columbia University in March 1923. A model of a radio receiver utilizing such inventions was also demonstrated at that meeting. The receiver thereby immediately became widely known. Its production on a commercial scale was begun a few months thereafter, and it soon found wide public acceptance.

(b) As of February 1924, when the ownership of the neutralization inventions was acquired by the plaintiff, one of these inventions—the basic invention—was covered by a patent, which had been issued on March 27, 1923; and two of these inventions were covered by applications for patents, which subsequently resulted in the issuance of a second patent on April 1, 1924 and a third patent on April 14, 1925. There was a fourth invention in the neutralization group as of February 1924; and a patent application relative to this invention was filed on April 7, 1924, resulting in the issuance of a fourth patent on March 16, 1926.

(c) By the time when the plaintiff acquired the ownership of the neutralization inventions in February 1924, the public demand for the type of radio receiver utilizing such inventions was so great that the manufacturers of the receivers were able to sell all that they could produce under licenses authorizing the use of the neutralization inventions. The public demand for and the production of these receivers continued to grow until 1928, when a peak was reached. Thereafter, this type of receiver began to be superseded by receivers utilizing a device known as the screen grid tube. By 1930, the type of receiver utilizing the neutralization inventions was obsolete, and no such receivers were manufactured after that year. No licenses authorizing the use of the neutralization inventions, apart from other inventions, were issued after 1930.

(d) In 1930 and thereafter, the plaintiff, in addition to the ownership of the neutralization inventions, owned other inventions that were useful in the radio field. After 1930, the plaintiff continued in the business of issuing licenses authorizing the use of inventions owned by it, and collecting fees for such use. Beginning in about 1932, the licenses issued by the plaintiff customarily granted the right to use all of its inventions, including the neutralization inventions, although the latter were not actually used after 1930.

(e) The unamortized cost of the neutralization inventions was properly deductible in computing the 1930 net income of the plaintiff for income tax purposes. Such a deduction for the tax year 1930 was allowed the plaintiff as a result of proceedings before the Board of Tax Appeals (32 B.T.A. 110) and the Circuit Court of Appeals for the Third Circuit (89 F.2d 513). That litigation was concluded in 1937.

7. (a) The three trade-marks referred to in finding 4 had been registered by the Patent Office on August 21, 1923. One of these trade-marks was the name "Neutrodyne," which had been registered "for radio receiving sets" and which was used to refer to receiving sets embodying the neutralization inventions. Another trade-mark was the name "Neutroformer," which had been registered "for electrical transformers" and which was used to refer to a coil that constituted a component of the radio receiving set embodying the neutraliza-

tion inventions. The third trade-mark was the name "Neutrodon," which had been registered "for electrical condensers" and which was used to refer to a condenser that constituted a component of the radio receiving set embodying the neutralization inventions.

(b) As of the time when the ownership of these three trade-marks was acquired by the plaintiff in February 1924, they had attained wide public acceptance. The trade-mark Neutrodyne was the most popular of the three names. The use of these trade-marks continued and increased until 1928, and then began to decline with the beginning of the obsolescence of the type of receiver that utilized the neutralization inventions. After that type of receiver became obsolete in 1930, the trade-marks Neutrodyne, Neutroformer, and Neutrodon were no longer used.

(c) While the type of radio receiving set that utilized the neutralization inventions was popular, licenses authorizing the use of such inventions also granted the right to use the trade-marks Neutrodyne, Neutroformer, and Neutrodon. Such licenses required that radio receiving sets manufactured through the use of the neutralization inventions be advertised and marked as Neutrodyne sets. However, there were many violations of this particular requirement. Letters of complaint were written by the plaintiff, but the plaintiff did not take any action in the courts because of such violations.

(d) After the type of radio receiving set that was based upon the neutralization inventions became obsolete in 1930, the plaintiff discontinued the issuance of licenses that related only to the use of the neutralization inventions and the trade-marks Neutrodyne, Neutroformer, and Neutrodon. In about 1932, the plaintiff began the issuance of blanket licenses authorizing the use of all the plaintiff's inventions, including the neutralization inventions, but these licenses did not refer specifically to the use of the trade-marks Neutrodyne, Neutroformer, and Neutrodon.

(e) Following the conclusion in 1937 of the litigation regarding the right of the plaintiff, in computing its income tax for 1930, to take a deduction because of the loss on the neutralization inventions (see finding 6(e) ), the plaintiff in conferences with a representative of the Bureau of Internal Revenue raised the question whether, since radio receivers utilizing the neutralization inventions were no longer being made (having been superseded by receivers utilizing the screen grid tube), the plaintiff might take a deduction retroactively for the tax year 1931 because of a loss on the three trade-marks that had been used in connection with such receivers and component parts. The representative of the Bureau of Internal Revenue took the position that since the trade-marks still had a valid existence, no deduction with respect to them could be claimed by the taxpayer until it either disposed of the trade-marks or abandoned them. The matter was not pursued further by the plaintiff at the time.

(f) Prior to 1937, the balance sheets included in the plaintiff's annual reports to its shareholders contained as an asset a single amount reflecting the inventions, patents, patent rights, trade-marks, and agreements held by the plaintiff. These items received similar treatment in the balance sheets submitted by the plaintiff with its annual income tax returns, and in the plaintiff's annual reports to the Securities and Exchange Commission for 1935 and 1936. Beginning with the year 1937, however, the plaintiff adjusted its book values and records so as to segregate the inventions, trade-marks, etc. Thereafter, during the period 1937–1943, the balance sheets included in the plaintiff's annual reports to its shareholders showed trade-marks as an asset in the amount of $244,375. The balance sheets accompanying the plaintiff's annual income tax returns for these years also included trade-marks as an asset in the amount of $244,375.

(g) In preparing its income tax return for the year 1944, the plaintiff for

the first time formally claimed the right to take a deduction for income tax purposes because of a loss on the trademarks Neutrodyne, Neutroformer, and Neutrodon. (See finding 10 et seq.)

8. (a) The contract with the Independent Radio Manufacturers, Inc., referred to in finding 4 granted to the I. R. M. the exclusive right to issue licenses for the use of the neutralization inventions in the manufacture of radio receiving sets, and for the use of the trade-marks Neutrodyne, Neutroformer, and Neutrodon. The I. R. M. was essentially a trade association. Its stockholders consisted of a group of the smaller manufacturers of radio receiving sets. Under the contract previously mentioned, the I. R. M. granted to its constituent stockholders, and only to them, licenses covering the use of the neutralization inventions and the three trade-marks. Therefore, as of February 1924 and for several years thereafter, radio receivers utilizing the neutralization inventions were manufactured, and the trade-marks Neutrodyne, Neutroformer, and Neutrodon were used, exclusively by the stockholders (i. e., the members) of the I. R. M. under licenses issued by it pursuant to the contract between the plaintiff and the I. R. M. The I. R. M. collected from its stockholders royalties on the receiving sets manufactured by them; and the I. R. M., in turn, paid a royalty to the plaintiff

(b) On June 6, 1927, the contract between the plaintiff and the Independent Radio Manufacturers, Inc., was canceled. The plaintiff then entered into license agreements directly with various radio manufacturers, including those that had formerly been members (i. e., stockholders) of the I. R. M.

(c) The Independent Radio Manufacturers, Inc., became bankrupt after the cancellation of its contract with the plaintiff in 1927. The bankruptcy proceedings were concluded in 1931.

(d) For the tax year 1931, the plaintiff was allowed a deduction for income tax purposes because of the loss on the contract with the Independent Radio Manufacturers, Inc.

9. (a) By virtue of the employment contracts with Professor Hazeltine and Harold A. Wheeler mentioned in finding 4, the plaintiff acquired the exclusive right to any improvements in connection with the neutralization inventions that might be made by either of them during specified periods of time. However, no actual benefit was ever derived by the plaintiff from either of these contracts. The contracts expired in 1927.

(b) The plaintiff did not at any time formally claim deductions for income tax purposes because of losses on the employment contracts with Professor Hazeltine and Harold A. Wheeler. However, the matter of such losses was discussed during the course of conferences that were held several years after 1927 between the plaintiff and a representative of the Bureau of Internal Revenue, but the representative of the Bureau of Internal Revenue took the position that the statute of limitations had run against the taxpayer with respect to the assertion of claims based upon such losses.

10. (a) At a meeting of the board of directors of the plaintiff on February 11, 1943, there was adopted a resolution stating in part as follows:

"*Resolved*, that (1) the trade-marks Neutrodyne, Neutroformer and Neutrodon be not re-registered in the U. S. Patent Office but that said registrations be allowed to expire and (2) that this corporation abandon the said trademarks, surrender the same and renounce the exclusive right or privilege to use or employ the same in its business."

Pursuant to this resolution, the plaintiff permitted the registrations of the three trade-marks to expire in August 1943.

(b) At a meeting of the plaintiff's board of directors held on December 13, 1944, it was resolved as follows:

"*Resolved*, that the corporation abandon both the said registration of said trademarks and the said trademarks and any and all right,

exclusive or otherwise, arising from the said registration and trademarks at common law and further.

"*Resolved,* that the officers be and hereby are instructed to reflect in the accounts the abandonment of the trademarks by writing off the amount [$244,375] at which such trademarks are reflected in the accounts."

(c) Appropriate adjustments were subsequently made in the plaintiff's books of account pursuant to the instruction contained in the second of the two resolutions quoted in paragraph (b) of this finding.

(d) On February 15, 1945, the plaintiff's board of directors adopted a further resolution which approved the charging of the loss on the trade-marks in the amount of $244,375 against earnings for 1944.

(e) In the March 28, 1945 issue of Radio and Television Weekly, the plaintiff published an announcement giving notice that "as of and from December 1, 1944," it had abandoned the trade-marks Neutrodyne, Neutroformer, and Neutrodon, and had "dedicated said trademarks and tradenames and all rights thereunder to the public."

11. (a) The plaintiff duly filed its income tax return for 1944 on March 15, 1945. The return disclosed an income tax liability of $112,889.86, which amount was duly paid by the plaintiff in three installments of $28,222.46 each on March 15, July 2, and October 1, 1945, and in a fourth installment of $28,222.48 on January 2, 1946.

(b) In preparing its income tax return for 1944, the plaintiff took a deduction in the amount of $244,375 because of an alleged loss during that year on the trade-marks Neutrodyne, Neutroformer, and Neutrodon.

12. (a) Prior to March 15, 1948, and within a 3-year period after the filing of the plaintiff's income tax return for 1944, the plaintiff and the Commissioner of Internal Revenue entered into a timely written agreement extending until June 30, 1949 the time within which the plaintiff's income tax liability for 1944 might be assessed against the plaintiff or a notice of deficiency in such tax might be sent to the plaintiff.

(b) On March 25, 1949, the plaintiff signed in triplicate and transmitted by mail to an office of the Bureau of Internal Revenue in New York, N. Y., a document further extending until June 30, 1950 the time within which the plaintiff's income tax liability for 1944 might be assessed against the plaintiff or a notice of deficiency in such tax might be sent to the plaintiff. In a covering letter which accompanied the transmission of the three copies of this document, the plaintiff stated that it would expect to receive the third or triplicate copy of the document after it had been signed on behalf of the Commissioner of Internal Revenue. This document was signed on May 5, 1949 by a duly authorized agent of the Commissioner of Internal Revenue. However, the plaintiff did not receive a signed copy of the document or learn of its execution on behalf of the Commissioner of Internal Revenue until after June 30, 1949.

(c) A document further extending until June 30, 1951 the time within which the plaintiff's income tax liability for 1944 might be assessed against the plaintiff or a notice of deficiency in such tax might be sent to the plaintiff was signed by the plaintiff on May 1, 1950 and by a duly authorized agent of the Commissioner of Internal Revenue on May 3, 1950.

(d) A document further extending until June 30, 1952 the time within which the plaintiff's income tax liability for 1944 might be assessed against the plaintiff or a notice of deficiency in such tax liability might be sent to the plaintiff was signed by the plaintiff on April 26, 1951 and by a duly authorized agent of the Commissioner of Internal Revenue on April 27, 1951.

(e) A document further extending until June 30, 1953 the time within which the plaintiff's income tax liability for 1944 might be assessed against the plain-

tiff or a notice of deficiency in such tax might be sent to the plaintiff was signed by the plaintiff on March 25, 1952 and by a duly authorized agent of the Commissioner of Internal Revenue on March 28, 1952.

13. On July 17, 1952, the Commissioner of Internal Revenue sent to the plaintiff by registered mail a notice of a deficiency amounting to $96,062.42 in the plaintiff's income tax liability for the year 1944. This was based upon the disallowance of the $244,375 deduction claimed on the plaintiff's return because of the alleged loss on the trademarks Neutrodyne, Neutroformer, and Neutrodon, the reduction of an unrelated deduction to the extent of $6,825.91, and increases totaling $11,044.90 in other unrelated deductions, making a net increase of $240,156.01 in the plaintiff's taxable income, as determined by the Commissioner of Internal Revenue. The plaintiff did not petition the Tax Court of the United States for a redetermination of this deficiency. On December 12, 1952, the Commissioner of Internal Revenue assessed the deficiency of $96,062.42 and interest thereon of $44,615.07, or a total of $140,677.49, against the plaintiff. Thereafter, demand was made upon the plaintiff for payment of this assessment; and payment thereof was made by the plaintiff on December 29, 1952.

14. Subsequent to the payment of the deficiency and interest mentioned in finding 13, the Commissioner of Internal Revenue determined to reduce the plaintiff's income tax liability for 1944 to the extent of $466.23 as a result of an increase in a deduction for a State license fee over the amount previously taken into account. This tax overpayment of $466.23, together with interest thereon, was refunded to the plaintiff.

15. On August 25, 1953, which was within 2 years after the payment by the plaintiff of the deficiency and interest referred to in finding 13 and more than 6 months before the commencement of this suit, the plaintiff duly filed with the Internal Revenue Service a timely claim for the refund of such portion of the

$140,677.49 paid by the plaintiff on December 29, 1952 as was attributable to the disallowance of the $244,375 trademarks deduction claimed by the plaintiff for 1944. This claim has not been allowed or paid.

16. (a) In preparing its income tax returns for 1943 (the year during which the registrations of the trade-marks Neutrodyne, Neutroformer, and Neutrodon expired) and 1945 (the year during which the plaintiff published its public notice relative to the abandonment of these trade-marks and their dedication to the public), the plaintiff did not claim any deduction because of a loss during either year on the three trade-marks.

(b) The plaintiff's income tax return for 1943 disclosed an income tax liability of $180,676.79, which was duly paid by the plaintiff in three installments of $45,169.19 each on March 15, July 3, and September 13, 1944, and in a fourth installment of $45,169.22 on January 1, 1945.

(c) The plaintiff timely filed on February 6, 1946 a claim for a refund of $97,750 (plus interest) on its income tax for 1943, asserting that the trade-marks Neutrodyne, Neutroformer, and Neutrodon "were abandoned by non-renewal in 1943" and, therefore, that the plaintiff had been entitled to take a deduction of $244,375 in figuring its taxable income for 1943. This claim was disallowed by the Commissioner of Internal Revenue by means of a notice to the plaintiff dated January 5, 1953, and no part of the income tax paid by the plaintiff for 1943 has been refunded.

(d) The plaintiff's income tax return for 1945 disclosed an income tax liability of $378,777.14, which amount was duly paid by the plaintiff in three installments of $94,694.29 each on March 15, June 26, and September 5, 1946, and in a fourth installment of $94,694.27 on December 11, 1946.

(e) The plaintiff timely filed on March 15, 1949 a claim for a refund of $97,750 (plus interest) on its income tax for 1945, asserting that the trade-marks

Neutrodyne, Neutroformer, and Neutrodon "became worthless because of nonrenewal, abandonment, or other reasons, in 1945," and that the plaintiff had been entitled to take a deduction of $244,375 in determining its taxable income for 1945. This claim for refund was disallowed by the Commissioner of Internal Revenue by means of a notice to the plaintiff dated August 1, 1952. However, two income tax refunds for the year 1945 were made to the plaintiff on grounds unrelated to the present suit. On October 28, 1952, there was refunded to the plaintiff the sum of $10,443.98, plus interest thereon in the sum of $3,-637.51, or a total of $14,081.49. On July 9, 1953, there was refunded to the plaintiff the sum of $4,822.91, plus interest thereon in the amount of $1,872.67, or a total of $6,695.58.

17. The trade-marks Neutrodyne, Neutroformer, and Neutrodon were abandoned by the plaintiff in 1944.

18. Plaintiff's taxable income for the years 1931 to 1945, inclusive, as reported on its tax returns and as adjusted by the Commissioner of Internal Revenue, was as follows:

| Year | Net income before taxes or div. credit | Income tax | Excess profits tax | Taxable income | Total tax |
|---|---|---|---|---|---|
| | As reported | | | As adjusted | |
| 1931 | Tax return for this year not available. Submitted as evidence in tax case. | | | (65,567.87) | .......... |
| 1932 | (213,094.00) | .......... | .......... | 58,255.01 | .......... |
| 1933 | (131,633.44) | .......... | .......... | 137,670.46 | 18,929.69 |
| 1934 | 575,818.78 | 78,960.97 | .......... | 769,554.50 | 106,577.36 |
| 1935 | 321,714.64 | 44,235.76 | .......... | 593,840.19 | 81,653.03 |
| 1936 | 410,895.92 | 60,474.39 | .......... | 660,490.69 | 105,849.32 |
| 1937 | 551,006.59 | 81,490.99 | .......... | 736,386.52 | 126,184.54 |
| 1938 | 888,170.00 | 145,687.05 | 16,990.20 | 707,381.15 | 122,121.14 |
| 1939 | 741,560.05 | 125,583.91 | .......... | 744,161.24 | 126,078.14 |
| 1940 | 701,202.45 | 168,288.59 | 8,277.61 | 718,728.08 | 184,486.57 |
| 1941 | 1,180,331.93 | 290,638.17 | 244,281.41 | 1,192,492.54 | 545,290.98 |
| 1942 | 741,103.65 | 282,388.88 | 31,618.31 | No adjustment | |
| 1943 | 493,662.74 | 180,676.79 | .......... | 493,662.74 | 180,676.79 |
| 1944 | 298,474.68 | 112,889.86 | .......... | 537,465.13 | 208,486.05 |
| 1945 | 956,652.62 | 378,777.14 | .......... | 918,485.40 | 363,510.25 |

Conclusion of Law

Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover, together with interest as provided by law, and judgment will be entered to that effect. The amount of recovery will be determined pursuant to Rule 38(c).