MASSEY-FERGUSON, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2923–70. Filed November 8, 1972.

*Don S. Harnack* and *David H. Hopkins,* for the petitioner.
*Rex A. Guest,* for the respondent.

SIMPSON, *Judge:* The respondent determined a deficiency of $17,811 in the petitioner's 1961 Federal income tax. The only issue for decision is whether the petitioner is entitled to a loss for the abandonment of certain intangible assets in 1961.

### FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioner, Massey-Ferguson, Inc. (M–F, Inc.), is a Maryland corporation, which had its principal place of business in Des Moines, Iowa, at the time of the filing of its petition in this case. It filed its Federal income tax return for the taxable year ended October 31, 1961, with the district director of internal revenue, Detroit, Mich. A taxable or fiscal year of the petitioner will be identified by the calendar year in which it ends.

Since 1954, the petitioner has been a wholly owned subsidiary of Massey-Ferguson, Ltd. (M–F, Ltd.), a Canadian corporation. In 1952, the predecessor of M–F, Ltd., was named Massey-Harris, Ltd. (M–H, Ltd.), and the predecessor of the petitioner was named Massey-Harris, Inc. In that year, M–H, Ltd., acquired all the stock of a British company named Harry Ferguson, Ltd. In the following year, 1953, the United States subsidiary of Harry Ferguson, Ltd., Harry Ferguson, Inc., was merged into Massey-Harris, Inc.

Prior to the merger, both Massey-Harris, Inc., and Harry Ferguson, Inc., manufactured and sold throughout North America a full line of agricultural implements, such as tractors and various types of haymaking, harvesting, seeding, and tillage machines. After the 1953 merger, the petitioner operated two divisions, one of which carried on the former Massey-Harris, Inc., operations and the other, the former

Harry Ferguson, Inc., operations. Each division maintained a separate and distinct engineering group and a separate and distinct marketing group. Throughout 1953 and 1954, the Massey-Harris division sold its products to the farm trade through company-owned branches and independent dealers located in small rural areas, and the Ferguson division sold through independent distributors, called Ferguson distributors, who, in turn, had appointed dealers. The sales outlets of both divisions were almost completely oriented to the agricultural market. In 1957, plans to unify the operations of the two divisions and eliminate the Ferguson distributors were finalized, and in the next year, the unification was completed.

In 1954, the petitioner became interested in the newly developing field of light industrial equipment, and it began exploring various possibilities for developing a light industrial equipment product line to be sold to contractors and builders. It redesigned two models of agricultural tractors to equip them for industrial use, and although it did not manufacture industrial equipment in 1954, it did purchase light industrial equipment, which were attachable to its tractors, such as backhoes and front-end loaders for resale. The petitioner was not interested in entering the heavy industrial equipment field and developing and selling products, such as heavy earthmovers and Caterpillar-style tractors.

In late 1954, the petitioner's industrial sales manager met Charles J. Davis, the majority stockholder, president, and chief operating officer of Mid-Western Industries, Inc. (MI). Mr. Davis was the developer of a line of light industrial equipment. He had designed and manufactured the first front-end loader tractor attachment, which was marketed in 1944, and the first hydraulic dumping bucket, which was marketed in 1946. By late 1954, he had also designed, manufactured, and marketed the first low-cost streamlined farm loader and the first unconditionally guaranteed loader.

MI was a Kansas corporation with its sole manufacturing facility located in Wichita, Kans. During the last half of 1954 and the spring of 1955, MI manufactured and sold light industrial equipment, including front-end loaders which were designed to fit the Massey-Harris, the Ferguson, and the Ford tractors. Its products were sold primarily through general line distributors, and in 1955, MI had under contract approximately 18 such distributors. These distributors were located in large industrial centers of the United States, and they, in turn, had subdealers.

In early 1955, representatives of the petitioner visited Wichita, Kans., to evaluate MI, and it was apparent that MI was in need of additional financing. Subsequent to this initial visit, numerous discussions and conferences took place between Mr. Davis and the peti-

tioner's representatives, and in a letter dated April 1, 1955, Mr. Davis offered to sell MI to the petitioner or, alternatively, to enter into certain marketing arrangements with the petitioner. The petitioner did not wish to purchase MI immediately, and Mr. Lee J. Wolf, then a vice president of the petitioner, drafted a memorandum of understanding between MI and the petitioner, which was dated April 14, 1955, and signed by Mr. Davis and an officer of the petitioner. On May 31, 1955, a contract (the 1955 contract) between MI and the petitioner, which also had been written by Mr. Wolf, was executed.

The 1955 contract provided the petitioner with certain exclusive rights to purchase and sell MI products. Among these rights was the exclusive right to sell the "Pit Bull," a specially designed shovel loader developed by Mr. Davis. The agreement set out the commissions and purchase discounts the petitioner was to receive, and it also granted the petitioner an exclusive license in perpetuity to manufacture MI products outside of North America. It further provided the petitioner with an irrevocable option, exercisable on December 1, 1957, to purchase all of MI's assets, including land, buildings, machine tools, patents, goodwill, trademarks, toolage, and inventory. The amounts that would have to be paid for certain assets if the option was exercised were fixed, and the methods of determining the prices of other assets were included. If the option was exercised, MI was also to receive either a portion of the earnings from the manufacture of MI products over the next 3 years or a negotiated lump-sum payment. In addition, MI agreed to obtain from Mr. Davis a promise that he would not compete with the petitioner prior to December 31, 1960, if the option was exercised.

Under the terms of the 1955 contract, the petitioner promised to make an "interest free loan" of $250,000 to MI. If the option was exercised, the $250,000 was to be applied as a credit to the purchase price; if the option was not exercised, the loan was to be forgiven by the petitioner. The petitioner also agreed to make a $100,000 term loan at an interest rate of 5 percent. On June 1, 1955, Mr. Davis and the petitioner executed an agreement under which Mr. Davis covenanted that, in the event the petitioner exercised its option to acquire the assets of MI, he would not engage in any sales or manufacturing of equipment similar to MI's products within the United States or Canada prior to December 31, 1960.

Following the execution of the 1955 contract, Mr. Wolf had the primary responsibility on the part of the petitioner for coordinating activities with MI. Each month he received a report from MI indicating the sales of MI products by the petitioner and the amounts due as commissions pursuant to the 1955 contract.

In the spring of 1957, Mr. Davis believed the unification of the

Massey-Harris and Ferguson divisions and the termination of Ferguson distributors would harm the sale of MI products under the 1955 contract. He, therefore, asked the petitioner either to exercise immediately its option or to release MI from the 1955 contract. Conferences were held between MI and the petitioner concerning the exercise of the option, and it was agreed that pursuant to the 1955 contract, a lump-sum premium payment of $883,000 would be made to MI. On May 25, 1957, the petitioner exercised its option by means of a supplemental agreement which designated July 1, 1957, as the date of sale. The lump-sum payment was made on July 1, 1957, and from that time until October 1961, the petitioner operated MI as its industrial division.

Mr. Tom Aldrich was the tax manager of M-F, Ltd., and he had the responsibility of representing the petitioner in inventorying and valuing the tangible assets of MI according to the 1955 contract. In determining the total purchase price for the tangible assets, the parties adopted the values proposed by Mr. Aldrich and the representative of MI except for two minor changes, and $2,978,819.01 of the total purchase price of $3,861,819.01 was paid for the tangible assets. The petitioner believed that the fair market value of some of the tangible assets exceeded the values assigned to them under the 1955 contract and allocated $153,680.40 of the $883,000 lump-sum payment to those assets on its books. The petitioner allocated the remaining $729,319.60 of the lump-sum payment: $719,319.60 to Mr. Davis' covenant not to compete and $10,000 to patents.

At the time of the sale, the Davis name was well known and well respected in the light industrial equipment business. It was associated with innovation and represented a corporation which stood behind its products. The petitioner's name was not well known in the light industrial equipment business, and it intended to utilize the Davis name. It used the Davis name until the first quarter of its taxable year 1961 when the name was replaced by the Massey-Ferguson name. At that time, Mr. Davis' covenant not to compete expired; he had left the petitioner's employ in November 1958 and formed Davis Mfg., Inc. After 1960, Mr. Davis and Davis Mfg., Inc., produced a light industrial line under the Davis name.

During the first 6 months of 1957, approximately 65 percent of MI's total sales were made through a general line distributorship system. The individual distributors stocked units, maintained inventories of service parts, and performed service work. They were experienced and had contacts with industrial customers. Because of their location, these distributors were not in direct competition with the petitioner, and the petitioner continued to use the general line distributorship organization to handle the sale of its light industrial equipment. How-

ever, early in the calendar year 1960, the petitioner decided to terminate the distributorship organization because of management decisions to introduce a newly redesigned tractor line for both agricultural and industrial markets and to integrate the petitioner's industrial and agricultural marketing operations. The last of the distributorships was terminated in November or December of 1960, that is, in the petitioner's 1961 taxable year.

At the time of the sale of MI's assets, the MI operation was located in a modern one-story manufacturing facility in Wichita, Kans., and employed approximately 300 employees of which approximately 140 were skilled welders. MI also employed 16 engineers as well as skilled fabricators and machine operators, and it operated a heat-treat facility in its plant. It had a very fine second-line management group and very loyal employees. It was located in a labor area that had lower than average wage rates and an abundance of available labor. During the first 5 months of 1957, MI earned net income after taxes of $441,420. The petitioner continued the MI operation in Wichita as its industrial division, but in the spring of 1961, a decision to terminate the operation was made. In October 1961, the operation was terminated, and the plant and employees offered to other employers. After that time, the petitioner produced the same type of products in Detroit as it had in Wichita, although they were modified so as to fit only the M–F tractor, rather than several types of tractors.

One of the products originally manufactured by MI was the Pit Bull shovel loader. Although there had been some problems in the development of the Pit Bull, the petitioner, at the time it acquired MI's assets, believed that it would be successful and was interested in further developing it. However, the Pit Bull ultimately proved unsuccessful and was dropped from the Davis product line a "while" after the 1957 sale.

On its Federal income tax return for each of the taxable years 1957 through 1960, the petitioner claimed a deduction for a portion of the $719,319.60 which it had allocated to the covenant not to compete, and the respondent disallowed the deductions on the ground that the $719,319.60 of the lump-sum payment was paid for goodwill or going-concern value. The petitioner did not contest this disallowance and paid the resulting deficiencies.

On its Federal income tax return for the year 1961, the petitioner deducted $34,252.60 as a loss from the abandonment of goodwill. The respondent disallowed such deduction on the basis that the petitioner had failed to establish that there was an abandonment of such asset in 1961. The petitioner then filed a claim for the refund of $356,235 representing another $685,067 of goodwill which it claimed was abandoned in 1961. Such claim was disallowed for the same reason that the deduction was disallowed.

OPINION

The petitioner contends that in 1957, it purchased $719,319.60 of intangible assets; that these assets consisted of the Davis and Pit Bull trade names, the Davis product line, the general line distributorship system, and the going-concern value of the MI operation; that each of these assets was abandoned in 1961; and that as a result of the abandonment of such assets, it is entitled to a deduction with respect to them under section 165 of the Internal Revenue Code of 1954. The term "goodwill" has sometimes been used in different senses. In some cases, it has been used in a general sense to describe all intangible assets arising in connection with the operation of a business; in other cases, it has been used in a more limited sense to describe a single intangible asset. Compare *Parmelee Transportation Co.* v. *United States*, 351 F. 2d 619 (Ct. Cl. 1965), with *Webster Investors, Inc.* v. *Commissioner*, 291 F. 2d 192 (C.A. 2, 1961), affirming a Memorandum Opinion of this Court; *Maurice A. Mittelman*, 7 T.C. 1162 (1946) ; and *Nice Ball Bearing Co.*, 5 B.T.A. 484 (1926). As a result of the use of the term in different ways, some confusion has developed in the opinions as to whether "goodwill" is severable and as to whether there can be an abandonment of a part of "goodwill" so long as the business continues to operate. *Meredith Broadcasting Co.* v. *United States*, 405 F. 2d 1214 (Ct. Cl. 1969). However, there seems to be no real disagreement in the cases; at least now, it seems to be generally recognized that if there is a clearly identifiable and severable asset, its abandonment entitles the taxpayer to a loss deduction. *Meredith Broadcasting Co.* v. *United States, supra; Parmelee Transportation Co.* v. *United States, supra; Roy H. Park Broadcasting, Inc.*, 56 T.C. 784 (1971) ; *Maurice A. Mittelman, supra; Metropolitan Laundry Co.* v. *United States*, 100 F. Supp. 803 (N.D. Cal. 1951). The respondent accepts that proposition but contends that the petitioner has failed to prove what intangible assets were acquired in the 1957 sale and to prove that any such assets were abandoned in 1961.

Section 165(a) permits a taxpayer to deduct "any loss sustained during the taxable year and not compensated for by insurance or otherwise," and this Court has stated that to be entitled to an abandonment loss, the petitioner must show an intention "to abandon the property, coupled with an act of abandonment, both of which must be ascertained from all of the surrounding facts and circumstances." *Boston Elevated Railway Co.*, 16 T.C. 1084, 1108 (1951), affd. 196 F. 2d 923 (C.A. 1, 1952) ; see sec. 1.165–2(a), Income Tax Regs. Considering all the surrounding facts and circumstances, we hold that in 1961 the petitioner completed the abandonment of the Davis trade name, the general line distributorship system, and the going-concern value of the MI opera-

tion. We also hold that the petitioner has failed to show that it abandoned the Pit Bull name or the Davis product line in the taxable year 1961.

The petitioner utilized the Davis name during its taxable years 1957 through 1960 in marketing a light industrial equipment line. In the first quarter of the taxable year 1961, a decision was made by the petitioner to discontinue using the Davis name. The decision was implemented by mid-1961, and the Massey-Ferguson name replaced the Davis name. Furthermore, Mr. Davis' covenant not to compete expired on December 31, 1960, and Mr. Davis and Davis Mfg., Inc., which Mr. Davis had formed to manufacture light industrial equipment, were then free to compete with the petitioner. Under all these circumstances, it is clear that in 1961 the petitioner "permanently discarded" the Davis name. Sec. 1.165–2(a), Income Tax Regs.

When the petitioner purchased the assets of MI, approximately 65 percent of MI's products were being sold by general line distributors, and the petitioner maintained this marketing system. These distributors were experienced in selling industrial equipment, and because of their contacts with the industrial customer, they were in a very good position to distribute industrial line products. Early in 1960, however, the petitioner decided to introduce a single, unified tractor line for both the agricultural and industrial markets and to eliminate the general line distributorship system. Some of the distributorships were terminated before 1961, but the last of them was terminated in 1961. At that time, the petitioner permanently discarded the advantages of such marketing system. Although it continued in the field of light industrial equipment with a different marketing system, the general line distributorship system with its attendant advantages was abandoned in the taxable year 1961, and we find that the petitioner is entitled to a loss deduction for the abandonment of the general line distributorship system in such year. See *Boston Elevated Railway Co.*, *supra*.

The respondent contends, however, that a distributorship system should be treated in the same manner as a customer list, that the normal turnover of new customers for old customers does not constitute the abandonment of a customer list, and that the termination of the general line distributorship system merely effectuated such a turnover since the petitioner continued to sell industrial line products after such termination through a different marketing system. Even if the system were comparable to a customer list, the termination of the entire distributorship system obtained from MI was not the equivalent of "normal customer turnover." In the case of a customer list, one customer may lead to others so that the loss of a single customer does not result in the loss of a separate identifiable asset. Cf. *Indiana Broadcasting Corporation*, 41 T.C. 793, 808 (1964), reversed on another issue 350 F.

2d 580 (C.A. 7, 1965), certiorari denied 382 U.S. 1027 (1966). In the present case, an entire asset, the distributorship system, was abandoned, and the entire intangible value of the system was lost.

The petitioner argues that in 1957, it also acquired an intangible asset attributable to the going-concern or turnkey operation of MI at Wichita. It contends that a collection of assets, without an assembled and trained labor force and administrative staff, is less valuable than a turnkey operation such as MI. It further contends that the going-concern value of MI was abandoned in 1961, when MI division operations in Wichita were terminated, and the MI facilities and employees offered to other employers. In 1957, the MI operation was profitable, and the witnesses concerned with the sale indicated that the operation was a very desirable one. There was an assembled staff of employees, who were efficient and loyal; there was capable management; and in the Wichita area, the prevailing wage rate was relatively low, and there was an ample supply of skilled labor. When the petitioner terminated the MI operation, it did more than abandon a physical plant. It also abandoned the advantages which contributed to the going-concern value. When it commenced production of light industrial equipment in Detroit, it did not, as the respondent seems to contend, suddenly regain these advantages. Although the product line being produced in Detroit was somewhat similar to that which was produced by MI, it was not being produced by the operation to which the going-concern value had attached. Whether the intangible asset attributable to the product line was abandoned in 1961 is a different question, which will be considered later.

The respondent contends, nonetheless, that because the petitioner continued to manufacture light industrial equipment after 1961, it could not have abandoned the going-concern value attributable to the MI operation at Wichita. The continuance of a portion of a business does not prevent the recognition of an abandonment loss with regard to an intangible asset which is shown to have a reasonably ascertainable value and which is connected with the discontinued portion of the business. *Parmelee Transportation Co.* v. *United States*, 351 F. 2d 619 (Ct. Cl. 1965); *Metropolitan Laundry Co.* v. *United States*, 100 F. Supp. 803 (N.D. Cal. 1951). Thus, the intangible value attributable to laundry routes in San Francisco was abandoned when the routes were discontinued, even though the taxpayer continued to operate a laundry business in Oakland (*Metropolitan Laundry Co.* v. *United States, supra*), and the intangible value attributable to a liquor distributorship was permanently discarded when the taxpayer, who had been in the beer and liquor distributing business, continued only in the beer business (*Strauss* v. *United States*, 199 F. Supp. 845 (W.D. La. 1961)).

In the present case, the taxpayer, in essence, discontinued an entire turnkey operation. This operation was not simply moved intact to another location. Indeed, both the physical facilities and the employees of the MI division were offered to other employers. Thus, we hold that if the value of the MI operation can be reasonably ascertained, the petitioner is entitled to a loss for the abandonment of the going-concern value attributable to the terminated operation, even though it continued in the same line of business with a different operation.

In 1957, one of the intangible assets purchased by the petitioner was the Davis product line. The petitioner contends that it continued the production of this line until the Wichita plant was closed in 1961 and that the light industrial products subsequently produced in the Detroit plant were reengineered. To show that the line was reengineered, it relies on testimony that the equipment line produced in Detroit was modified so as to fit only M-F tractors. Such modification, however, does not show that the basic design and engineering of all the products of the Davis line were abandoned; it shows only that the products were modified to some undisclosed degree so as to be attachable to only one type of tractor rather than many types. Under these circumstances, we must find that the petitioner has failed to show that it "permanently discarded" the intangible value attributable to the Davis industrial line in its 1961 taxable year. Similarly, the petitioner has failed to show that the useful life of the Davis product line terminated in 1961.

Another intangible asset purchased by the petitioner was the Pit Bull trade name. Although the Pit Bull had not proven very successful at the time of the purchase of the MI assets, the petitioner believed that this specially designed shovel loader had great potential. However, the product proved unsuccessful, and the petitioner concedes that it discontinued using the name Pit Bull sometime prior to 1961. The petitioner contends, nonetheless, that such discontinuance did not constitute an abandonment because the mere nonuse of a name does not constitute abandonment. *W. B. Davis & Son, Inc.*, 5 T.C. 1195 (1945), upon which the petitioner relies, involved the alleged abandonment of machines which were used to produce a product that was no longer in public demand. The machines had salvage value in the year when the petitioner was claiming a loss deduction, and this Court found that the petitioner's actions in not disposing of the machines indicated an intention to preserve the machines. Similarly, in *Hazeltine Corporation* v. *United States*, 170 F. Supp. 615 (Ct. Cl. 1959), the court found an intent to preserve the asset. In the present case, no such finding can be made; the name was abandoned because the product was a failure; and it is clear that the abandonment did not occur in 1961.

Having decided that only some of the intangible assets were abandoned in 1961, we must now determine what portion of the lump-sum payment is allocable to the abandoned intangible assets. Of the $883,-000 lump-sum payment agreed upon in 1957, the petitioner allocated $10,000 to patents, and $153,680.40 to certain tangible assets, and those amounts are not in dispute. The petitioner originally allocated the remaining $719,319.60 to the covenant not to compete, but the respondent allocated such amount to the purchase of "goodwill." The petitioner now accepts the respondent's allocation and contends that the intangible assets purchased were the Davis and Pit Bull trade names, the Davis product line, the general line distributorship system, and the going-concern value of the MI operations in Wichita. The 1955 contract called for the transfer of such assets in the event the petitioner exercised its option to purchase the MI assets, and we have found that such intangible assets were acquired by the petitioner in 1957. The petitioner included such items as know-how and research in computing the value of the product line, and we hold that the $719,319.60 is allocable to the intangible assets, consisting of trade names, product line, general line distributorship system, and going-concern value.

In presenting its suggested allocation, the petitioner relied on two expert witnesses, Mr. Wolf, who also testified as a nonexpert with respect to certain facts regarding the 1957 sale, and a retired Internal Revenue Service valuation engineer. We reject the contention that the testimony of the latter witness should be disregarded as being based on facts which are not in evidence. Without deciding whether such facts must be in evidence, we find that the witness' testimony was based on information contained in the exhibits introduced into evidence.

In valuing the individual intangible assets, each witness valued the trade names on the basis of the reputation of the Davis products in the light industrial products field; the general line distributorship system on the basis of the amount of MI sales which it made in the first part of 1957; the product line on the basis of reproduction costs; and going-concern value on the basis of the costs of moving and reestablishing the operations elsewhere. Each witness concluded that the aggregate value of the intangible assets exceeded $719,319.60, and the petitioner contends that there should be allocated to each intangible asset that percentage of the $719,319.60 which the value of each intangible asset bears to the value of all such assets. See *North American Service Co.*, 33 T.C. 677 (1960).

In 1957, the Davis name was well respected in the light industrial products field, while the petitioner's name was basically connected with the agricultural products field. Part of the value of the Davis corporate name was due to Mr. Davis' reputation as an innovator and

part to the Davis corporation's record of standing behind its products. In the middle of 1957, the Pit Bull appeared to have worthwhile possibilities, and therefore, the Pit Bull name had some value, even though it was soon recognized that the product was a failure and the name was abandoned. We were generally satisfied by the approaches adopted by both of the experts to determine the value of the trade names, and accordingly, we find that the value of the Davis and Pit Bull names was $88,750, the mean between the values determined by the two experts. We further find that $5,000 of this amount is allocable to the Pit Bull trade name and $83,750 to the Davis trade name.

In 1957, the general line distributorship system was a viable sales organization which the petitioner desired to maintain. Indeed, the petitioner's plans to consolidate sales organizations in 1957 were concerned solely with the merger of the Massey-Harris and Harry Ferguson sales organizations. We believe that both expert witnesses used reasonable, although somewhat different, methods of valuing the distributorship system. Their reliance on incomplete sales records was also reasonable. The records were sufficient to accurately determine total sales, and the incompleteness was due to the fact that some records had been lost when the petitioner's corporate offices were moved. Considering all the circumstances, we find that the general line distributorship system was worth $210,500.

We also find that the witnesses were reasonable in valuing the Davis product line in terms of what it would have cost in 1957 to establish a similar line. Contrary to the respondent's position, Mr. Wolf was qualified to value the product line. He had worked in the experimental engineering department of the petitioner, and as vice president of a corporation manufacturing equipment somewhat similar to the Davis product line, he is presently concerned with the evaluation of engineering projects. Indeed, Mr. Wolf's valuation was generally supported by that of the second expert witness and the testimony of Mr. Davis, and we conclude that the product line had a fair market value of $254,500 in 1957.

The petitioner valued the final intangible asset, going-concern value, in terms of how much it would cost to move and reestablish the MI operation in a high-wage area, and we agree with the respondent that such method was improper. We completely fail to understand how the cost of moving the operations to a high-wage area would measure the going-concern value. Going-concern value has been defined as "The value existing in a proven operating property, considered as an entity with business established, above that of a property complete and ready to operate but without business." Appraisal Terminology and Handbook 85 (4th ed. 1962). Such value is not indicated by the estimates as to the profits that would be lost or the expenses that would be incurred in moving the physical plant or in training

employees, if the plant were moved. There was no indication as to the length of time required to establish, as opposed to move and reestablish, the MI operation, nor was there any indication of whether the suggested training costs included the costs of training engineers and management personnel. Indeed, Mr. Wolf stated that he was ignoring the value of good management and loyal employees in computing moving costs. Under these circumstances, the petitioner's estimates are insufficient to value such components of MI's going-concern value as employee loyalty, management quality, and management experience.

Although we find unacceptable the petitioner's suggested method for determining the going-concern value of the MI operations, there is sufficient other evidence from which to determine such value. The parties are in agreement that $719,319.60 of the lump-sum payment was allocable to intangible assets, and we have found that this amount was paid for specifically identifiable assets. We have determined the value of specified assets, other than going-concern value, to be $565,-000, and in the absence of other evidence, we assume that the amount paid for each such intangible asset is equal to its fair market value. *United States* v. *Davis*, 370 U.S. 65 (1962). Accordingly, we conclude that the remaining $165,569.60 was paid for going-concern value. *First Pennsylvania Banking & Trust Co.*, 56 T.C. 677, 697 (1971).

We, therefore, hold that the petitioner is entitled to an abandonment loss of $459,819.60 in 1961.

*Decision will be entered under Rule 50.*