Diamond Alkali Company v. Commissioner.
Diamond Alkali Co. v. Commissioner
Docket No. 35913.
United States Tax Court
1954 Tax Ct. Memo LEXIS 317; 13 T.C.M. (CCH) 88; T.C.M. (RIA) 54040; January 29, 1954
Sidney B. Gambill, Esq., and Joseph G. Robinson, Esq., for the petitioner. S. W. Ozark, Esq., and James A. Scott, Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The Commissioner determined the following deficiencies in the petitioner's income tax: Year
Amount
1944
$ 2,999.08
1945
4,358.19
1946
2,185.41
1947
89,058.77
1948
238,734.57
The issues originally presented by the pleadings were whether the respondent erred in determining (1) that the profit of $253,375.83 realized by the petitioner in December 1947 from the sale of a power plant at Alpena, Michigan, is taxable as ordinary income; (2) that the total profit of $650,844.64 realized by the petitioner in 1948 from the sales of quarry properties at Alpena, Michigan, is taxable as ordinary *318 income; (3) that the petitioner sustained an abandonment loss in the year 1948 in the total amount of $564,668.44 representing the undepreciated costs of concrete work, docks, buildings, lands, etc., located at its Alpena, Michigan, quarry, rather than a loss on the sale of the property in 1952, a position taken by petitioner with respect to that year; and (4) that the petitioner is not entitled to deductions for retirement losses on its assets in the following amounts: Year
Amount of Loss
1944
$ 4,874.24
1945
36,515.99
1946
3,132.31
1947
25,197.88
1948
13,291.13
By reason of respondent's concessions, only the third and fourth issues are left for our determination. Findings of Fact Some of the facts have been stipulated and are found as stipulated. Diamond Alkali Company (hereinafter referred to as Diamond or the petitioner) is a corporation organized and existing under the laws of the state of Delaware, with its principal office at Cleveland, Ohio. For the calendar years 1944, 1945, 1946 and 1947 the petitioner filed its Federal income tax returns with the collector of internal revenue for the twenty-third district of Pennsylvania at Pittsburgh, *319 Pennsylvania. For the calendar year 1948 the petitioner filed its Federal income tax return with the collector of internal revenue for the eighteenth district of Ohio at Cleveland, Ohio. The petitioner at all times material hereto kept its books and filed its Federal income tax returns on the calendar year basis and on the accrual method of accounting. Diamond is a producer of over 100 diversified products, such as basic alkali products, chlorine and chlorinated products, silicate products, chromium chemicals, detergents and chemicals for the laundry industry, coke and by-products, calcium carbonates, industrial cleansers and chemicals for the food, dairy, and beverage industries, magnesium chemicals, and miscellaneous products. Limestone is indispensable to its operations. In 1931 Diamond turned to the Thunder Bay region near Alpena, Michigan, for a supply of limestone. Around 1,600 acres of land were there acquired for that purpose. Under license from the Federal Government, a ship channel was dredged from the floor of Lake Huron, and a substantial concrete dock, 650 feet long and 250 feet wide, was constructed into the lake contiguous to the facilities of petitioner. Buildings *320 were erected, huge crushing equipment installed, and a quarry was placed in operation. An extensive network of tracks interlaced the property, even extending to the Detroit & Mackinac Railroad from out on the dock itself. In the beginning, Diamond procured electrical power at Thunder Bay from the local utility, Alpena Power Company (hereinafter sometimes referred to as Alpena). But as the quarry grew in size and output (the trackage increased 1,000 per cent by 1945) pressure was exerted upon Alpena to meet the quarry's demand for additional electrical energy. By 1938 it was unable to keep pace with Diamond's needs. Alpena asked that Diamond construct its own electrical generating station. Diamond erected its own power plant in 1938 at a cost of $174,521.53. This power plant was built upon made-land created by dumping, under permit from the Federal Government, byproducts from the quarry operations into Lake Huron. Diamond never obtained title to this fill superimposed upon Government owned land underlying the waters of Thunder Bay. After Diamond's power plant was completed, it entered into a reciprocal arrangement with Alpena whereby Diamond at times furnished the local utility with *321 electrical power, and, at other times, Alpena supplied Diamond with power. Diamond then owned a completely integrated quarry, crushing and loading plant. In 1944 petitioner closed down its Thunder Bay quarry because the silica content of the limestone therefrom, called Alpena Stone, was so high that it increased the cost of the manufacture of soda ash to such a point that petitioner found it more profitable to purchase superior limestone, called Calcite Stone, from a subsidiary of United States Steel. At this time less than 10 per cent of the limestone had been removed from Thunder Bay quarry. Thereafter, petitioner maintained Thunder Bay quarry in a "stand-by" condition at a cost of approximately $170,000 per year until 1947. During the period that Thunder Bay quarry remained idle, petitioner made detailed studies of the feasibility of resuming its operation and extracting from a lower level limestone with a lower silica content than that produced in 1944. Upon completion of such studies, petitioner's president submitted a memorandum dated August 8, 1947, to the petitioner's board of directors. In this memorandum petitioner's president reported that there was an $80,000 advantage *322 annually in using limestone from Calcite rather than Alpena limestone even under conditions most favorable to the latter's use. He further reported that retention of petitioner's investment in Thunder Bay quarry could not therefore be justified. He reported further that the Michigan Limestone & Chemical Co. (hereinafter called Michigan), petitioner's source of Calcite limestone, had offered to enter into a long-term contract to supply such limestone at an advantageous price to petitioner and to purchase petitioner's crushing equipment for $550,000. He estimated that the liquidating value of Thunder Bay quarry was $1,183,327 as compared with its book value of $1,280,305. He therefore recommended to petitioner's board of directors as follows: "Subject to confirmation of the estimated salvage values and the negotiation of a satisfactory long-term contract with the Michigan Limestone and Chemical Company, it is proposed that the Alpena operation be liquidated." On September 8, 1947, Diamond's board of directors authorized its president to sell the power plant and removable equipment at Thunder Bay. On October 17, 1947, Diamond executed a long-term contract with Michigan for the supply *323 of Diamond's requirements of calcite stone. The contract provided: "1. Michigan hereby agrees to sell to Diamond and Diamond hereby agrees to purchase from Michigan, Diamond's requirements, not to exceed 1,500,000 gross tons per year of Kiln stone, at Diamond's alkali works located at Painesville, Ohio, for No. 2 kiln stone and for cement stone during the period commencing January 1, 1948 and ending December 31, 1957, and year to year thereafter provided however, this contract may be terminated by Diamond or Michigan on December 31, 1957 or on December 31 of any year subsequent thereto upon giving the other party notice thereof in writing not less than three (3) years prior to such termination date. In the event Diamond shall at any time after June 1, 1951 be able to obtain its requirements of kiln stone in any manner, including but not limited to quarrying the stone in quarries operated by Diamond or a subsidiary of Diamond, at a cost which is more advantageous to Diamond, after making allowances or adjustments for differences in quality, than is provided for in this contract Diamond may give notice thereof to Michigan and if Michigan shall fail or refuse within one hundred twenty *324 (120) days after receipt of such notice to amend this contract to provide for the adjustment of the price specified herein to meet such lower cost available to Diamond, then this contract shall terminate without further notice or action on the part of either of the parties hereto on December 31 next following the expiration of such one hundred twenty (120) days' period, or on any subsequent December 31 as may be designated by Diamond in the aforesaid notice, during the term of this contract." On November 15, 1947, Diamond's president again reported to the board of directors. He told them that Alpena had offered to buy the petitioner's power plant for $350,000. Three days later the board of directors authorized him to complete the sale of the power plant to Alpena. The indenture provided: "3. Grantor reserves an easement to construct and maintain a power line to the presently existing pumphouse or any new pumphouse constructed by Grantor in accordance with this Indenture for the purpose of driving and controlling Grantor's equipment in any said pumphouse, such power line easement to be over the premises first above described and in a position mutually agreeable to the parties hereto. *325 " Petitioner also sold certain land to the city of Alpena. The contract for the sale provided, in part, as follows with respect to fines [1] situated on other land of petitioner: "3. The parties agree that the Purchaser shall have the privilege of removing fines and to pay for them at the rate of thirty-five (35) cents per net ton, such settlements on fines removed to be made periodically at the convenience of the Purchaser but not less often than annually and on or before August 1 of each year during the life of this contract. The Purchaser agrees to keep accurate records of all fines removed and including both such fines as are removed for use of and by the Purchaser and such fines as may be sold to third parties, and it is agreed that the Seller may, if it chooses so to do, inspect such records at the City Hall, Alpena. The Purchaser agrees to protect the property against trespass and to forbid removal of any fines by third parties, except those sold or authorized to be removed by the Purchaser." The board of directors also authorized the sale of the crushing, screening, and loading equipment to Michigan. The contract with Michigan *326 provided that Michigan might keep and store the machinery on the property until December 31, 1948, or until such later date as Diamond might designate. Petitioner also sold equipment to Builders Steel Supply Company. The sales agreement with Builders Steel Supply Company provided: "1. All steel rails, frogs, switches, switch stands now located on Seller's quarry property at Alpena, Michigan, with the exception of the track starting at the interchange to the Detroit and Mackinac Railroad and continuing to and ending at the track on the loading dock and the 6 spur tracks to the machine shop, storeroom, and roundhouse, all as shown on drawing dated June 16, 1948, copy of which is attached hereto and is a part of this agreement. The above materials to be sold at the rate of $50.50 per gross ton of 2240 pounds 'as is and where is' (as said term is hereinafter defined);" On December 31, 1947, Diamond sold the power plant at Thunder Bay to Alpena for $350,000. At the time of sale, the power plant had an adjusted basis of $96,624.17, and Diamond realized a gain of $253,375.83 on the transaction. Diamond reported this profit as a long-term capital gain in its return for 1947. The power *327 plant sold to Alpena had an original cost of $174,521.53. Over the periods prior to the sale, Diamond claimed and was allowed depreciation deductions aggregating $77,897.36 with respect to this property. Further sales of Thunder Bay quarry assets were made by petitioner during 1948 for a total amount of $1,094,047.39. Part of this money came from Michigan, which purchased the crushing, conveying, and loading equipment for $577,190 on January 5, 1948; part from the sale of two Erie shovels for $220,000; and part from the sale of railroad locomotives cars, etc., for $182,894.47. The remainder of the sales, making up the total of $1,094,047.39, consisted of sales of automobiles and trucks, electrical equipment, portable machinery and spares, miscellaneous, machine shop equipment, office equipment, and land. The properties sold in 1948 had an aggregate adjusted cost basis of $443,202.75, and Diamond realized a profit for tax purposes of $650,844.64 upon these 1948 sales. This profit, like the gain realized on the sale of the power plant in 1947, was reported by Diamond in its 1948 return as long-term capital gains. The properties which were sold by Diamond in 1947 and 1948 were held *328 by Diamond for more than six months. In its 1947 return, Diamond reported gains and losses from the sale of capital assets held for more than six months, such as stock in other corporations, treasury notes, automobiles, machinery and equipment, buildings, etc., and including the power plant at Alpena. The net gain from the sale of all of these assets reported in its return amounted to $499,934.76. In the petitioner's 1948 return it reported gains and losses from the sale of capital assets held for more than six months, such as automobiles, machinery, buildings, office equipment, etc., and including the gains from the sale of the Alpena quarry properties which were sold in 1948. The net gain from the sale of all of these assets reported in said return amounted to $672,229.45. After the sale of the above-mentioned Thunder Bay quarry assets, Diamond still owned approximately 1,000 acres of land, the 650-foot dock, a locomotive shop, a machine shop, storerooms, some houses, extensive trackage, and a private sewer. These properties had an aggregate initial cost of $877,609.62 and an adjusted basis of $564,668.44 at the end of 1948. Between the years 1946 and 1952 petitioner received *329 miscellaneous income, representing proceeds from sales of "fines" removed by the purchaser under a contract calling for annual settlements and rentals received from some houses and for the storage of equipment on the quarry property, from its Alpena properties as follows: Sales of
Year
Stone, etc.
Rentals
Total
1946
$17,125.77
$ 846.37
$17,972.14
1947
51,092.95
871.47
51,964.42
1948
3,368.70
395.91
3,764.61
1949
3,849.29
10,000.00
13,849.29
1950
3,381.37
12,000.00
15,381.37
1951
2,416.38
12,000.00
14,416.38
1952
12,000.00
12,000.00 Petitioner delivered electrical energy to the Alpena Power Company from its quarry power plant up to the time it sold the plant in 1947. Some time after March 21, 1948, Diamond circulated a brochure among the largest real estate firms in the country in an attempt to sell the left-over properties. There were employees of petitioner on the properties until the latter part of 1948. Thereafter, an attorney in Alpena, Michigan, acted as overseer of the properties and retained the keys to the properties until they were sold in 1952. The following schedule shows the amounts of real estate taxes assessed *330 by the City of Alpena against the petitioner's Thunder Bay quarry properties and the dates such taxes were paid: Year
Kind of Tax
Amount
Date Paid
1946
Summer property tax
$24,141.10
7/29/46
1946
Winter property tax
5,694.00
12/20/46
1947
Summer property tax
15,229.20
7/15/47
1947
Winter property tax
5,694.00
12/27/47
1948
Summer & Winter property tax - reassessed
1952 - description discrepancy
4,618.86
12/17/52
1949
Summer & Winter property tax - reassessed
1952 - description discrepancy
4,880.87
12/17/52
1950
Summer & Winter property tax
5,653.57
12/15/52
1951
Summer & Winter property tax
5,695.81
12/15/52
1952
Summer & Winter property tax
5,154.78
12/17/52
The following schedule shows the assessment of real property taxes by the Township of Alpena, Alpena County, Michigan; and the payments of such township taxes with respect to properties of the petitioner located outside the limitation of the City of Alpena, Michigan: Year
Amount
Date Paid
1946
$482.58
(Township Record) No date posted - current.
1947
429.35
(Township Record) No date posted - current.
1948
410.72
Delinquent - sold at tax sale 5/1/51.
1949
474.23
$286.45 paid 5/1/51 by J. Bezette, office manager of the Huron Portland
Cement Company, Alpena, Michigan; balance of $187.78 paid 12/15/52
by petitioner.
1950
404.53
12/15/52
1951
562.30
12/15/52
1952
571.16
(Township Record) No date posted - current.
*331 The properties which were sold on May 1, 1951, for delinquent 1948 taxes, as shown in the preceding paragraph, were subsequently redeemed by the petitioner. Sometime after the sales totaling $1,094,047.39 were consummated in 1948, Diamond's controller sought advice from Diamond's general counsel as to whether the left-over properties should be written off for tax purposes in 1948 as an abandonment loss. The controller was advised to claim an abandonment loss in the first open year. This advice coincided with that which Diamond had received from its accountants. Accordingly, the petitioner charged off the unsold quarry assets on its books in 1948. From 1948 until these left-over properties were sold to the Huron Portland Cement Company in 1952 for $75,000, Diamond received a total income from them of $59,411.65, derived in large measure from rents as previously shown. Respondent determined in the deficiency notice that no abandonment loss was allowable because the gain realized by petitioner from sales in 1947 and 1948 of Thunder Bay quarry assets should be determined by using the adjusted basis of all the quarry assets combined since petitioner had abandoned all of such assets *332 as a single property or operation before selling any of them. He further determined that petitioner's gain from sales of Thunder Bay quarry assets in 1947 and 1948 represented recovery of salvage value of abandoned property and accordingly was an ordinary gain. Respondent further determined that petitioner realized an ordinary gain in the amount of $253,375.83 in the taxable year 1947, and an ordinary gain in the amount of $86,176.20 in the taxable year 1948 from the sales of Thunder Bay quarry assets in those years. Respondent determined the ordinary gain in the amount of $86,176.20 for the year 1948 by offsetting the gain of $650,844.64, reported by petitioner in its income tax return for the taxable year 1948 as capital gain from sales in that year of Thunder Bay quarry assets, against the deduction in the amount of $564,668.44 claimed by petitioner in its income tax return for the taxable year 1948 as ordinary loss on the abandonment of the unsold quarry assets, in accordance with his determination that the amount realized by petitioner from the 1947 and 1948 sales of Thunder Bay quarry assets should be determined by using the adjusted basis of all the quarry assets combined because *333 petitioner had abandoned all of such assets as a single property or operation before selling any of them. The left-over and unsold Thunder Bay quarry properties did not become worthless in 1948 and were not abandoned by petitioner in that year. Petitioner employs single item accounts in maintaining its property records and the straight line method of depreciation. Each year, in the 13 Diamond plants scattered throughout the country, items of equipment are removed from production and relegated to the scrap pile because their useful lives have expired. Sometimes, because the demands of production have constructed their useful lives to a point not anticipated, these items are transferred to the scrap pile before Diamond has recovered their costs through depreciation deductions. When the scrap pile is anywhere from one carload to five carloads in size, it is sold to scrap metal dealers. Diamond consistently has claimed retirement losses on the items thus discarded from use, measured by the amount of the cost not theretofore recovered through depreciation deductions. All receipts arising from the sales of discarded assets have been treated and taxed as ordinary income. In 1938, following *334 and as a result of an examination by internal revenue agents, Diamond set up an elaborate property record system by individual assets. The lives of the properties were estimated, and thereafter Diamond consistently claimed and was allowed depreciation deductions on a straight line basis which in turn were based upon the estimated useful or productive life of each particular item employed in petitioner's business. Diamond did not compute its depreciation on an average life basis. For the taxable year 1944, Diamond claimed a total loss of $21,792.43 on such assets as were scrapped during that year, and the Commissioner disallowed $4,874.24 thereof. For the taxable year 1945, Diamond claimed a total loss of $101,188.64 on assets scrapped during that year, and the Commissioner disallowed $36,515.99 thereof. For the taxable year 1946, Diamond claimed a total loss of $8,455.05 on assets scrapped during that year, and the Commissioner disallowed $3,132.31 thereof. For the taxable year 1947, Diamond claimed a total loss of $122,854.24 on assets scrapped during that year, and the Commissioner disallowed $25,197.88 thereof. For the taxable year 1948, Diamond claimed a total loss of $35,964.43 *335 on assets scrapped during that year, and the Commissioner disallowed $13,291.13 thereof. Opinion. The petitioner in its income tax return for 1948 took a deduction of $564,668.44 as a loss sustained on the abandonment of the following Thunder Bay assets, sometimes herein referred to as left-over properties: 1,000 acres of land, the 650-foot dock, a locomotive shop, a machine shop, storerooms, some houses, extensive trackage, and a private sewer. Although in the deficiency notice the respondent stated no abandonment loss was allowable, nevertheless in determining the deficiency the loss deducted by petitioner was allowed in full. The parties have amended their pleadings in various respects regarding this issue. However, as they now stand, the pleadings present the question of whether there was an abandonment in 1948 of the foregoing properties. In order that an abandonment be shown, it must be established that there be an intention on the part of the owner to abandon the property, together with an act of abandonment, both of which must be determinable from all of the surrounding facts and circumstances. ; ; *336 ; ; ; affd., . Nonuse, alone, is not enough. ; ; The respondent contends that there was an abandonment of the properties in 1948 and in support of his contention relies on the following: Petitioner's action in charging off the property on its books in 1948, in deducting the loss on its income tax return for that year, in furnishing respondent's agent detailed schedules to substantiate the abandonment loss deducted for 1948, in alleging in its original petition that it abandoned the property in 1948, in failing to pay real estate taxes on the property during the period after 1947 and until December 15, 1952, although it had the money to pay such taxes and there was a sale of some of the property at a delinquent tax sale, and in filing claims for refund of income taxes for 1945, 1946 and 1947 for consideration in event respondent determined that abandonment occurred in one of those *337 prior years. The petitioner takes the position that there was no abandonment of the properties in 1948. It contends that there can be no abandonment of property having a remaining useful life where the owner, while carrying out a preconceived intent, attempts to sell it and continues to exercise dominion and control over it until it is sold. A corporation's intent with respect to a given matter must be shown by the acts of its officers charged with the responsibility of acting with respect thereto. We find nothing here to indicate that any officer of the petitioner or group of officers charged with the responsibility of abandoning corporate assets ever took any action indicating an intent to abandon the properties in question. The evidence shows that in charging off the properties on its books and taking deduction therefor in its income tax return for 1948, the petitioner was acting pursuant to the advice of its accountants and its general counsel. The claims for refund of taxes for 1945, 1946 and 1947 clearly indicated that they were filed merely as a protective measure and were to be considered only in event the respondent determined that abandonment occurred in one of those *338 prior years. The evidence shows that real property taxes, both city and township, for years prior to 1948 were paid currently as they came due. However, with a minor exception, such real estate taxes for 1948 and subsequent years through 1952 were not paid until the middle of December 1952, at about which time a buyer was found for the properties. While the petitioner's action with respect to the real estate taxes tends to support the respondent's position, it is only one of the factors which must be considered. At the time Diamond charged off the properties on its books it was circulating a brochure among real estate dealers trying to sell the properties. The contract for the sale of the power plant to Alpena contained provisions that if the quarry should be operated again Alpena would furnish the power to run it. Diamond's supply contract with Michigan provided that Diamond could cancel the contract at the end of a four-year period or at the end of any calendar year thereafter if it was able to obtain stone more advantageously from any other source, including the operation of its own quarry. It is also significant that the track, starting at the interchange to the Detroit & Mackinac *339 Railroad and continuing to and ending at the track on the loading dock, and the 6 spur tracks to the machine shop, storeroom and roundhouse, were not included in the sale of rails, frogs and switches to Builders Steel Supply Company. Furthermore, the contract for the sale of land to the City of Alpena provided that Alpena could remove "fines" from the property and would reimburse Diamond therefor at the rate of 35 cents per net ton. In the contract with Michigan for the sale of machinery and equipment, it was provided that Michigan might keep and store the machinery on the property until December 31, 1948, or until such later date as Diamond might designate. From 1948 until the sale of the property in 1952 Diamond received a total of $59,411.65 as rents and from the sales of stone and "fines." During the period from 1948 until the sale in 1952 Diamond's attorney in Alpena looked after the properties and had the keys to the buildings. In view of the situation presented, it is our opinion and we have found as a fact that the left-over properties in question not only were not worthless in 1948 but were not abandoned by petitioner in that year. The remaining issue relates to the *340 disallowance of deductions taken by petitioner as losses sustained on the retirement of assets. The reason given by respondent for the disallowance was that the depreciation of such assets was not based on the maximum useful life of each particular asset as required by section 29.23(e)- 3, Regulations 111, which states: "* * * in the case of single item accounts if the rate of depreciation is based on the maximum expected life of the asset, a deduction for the basis of the asset * * * less its salvage value is allowable upon its retirement. * * *" The petitioner's method of recovering its capital investments has been consistent. It has employed single item accounts and the straight line method of depreciation. That method, in turn, was based upon the estimated useful or productive life of each asset employed in petitioner's business. Because the demands of production have constricted their useful lives, some items were scrapped before Diamond had recovered by depreciation deductions its capital investments. In such instances Diamond has placed the items in a scrap pile and after a substantial amount has been accumulated has sold them as scrap to metal dealers. All receipts from *341 such sales have been reported as ordinary income. A consistent application of the foregoing method returns to the taxpayer its investment and does not distort income in any year. In further support of his position that the depreciation deductions taken by petitioner were not based on the maximum useful life of each asset, the respondent contends that petitioner did not eliminate from its books the accounts for those properties which were continued in use beyond their useful or productive lives as estimated by petitioner. So far as appears, there were at most only a few occasional and isolated instances of property being continued in use after the expiration of its life as estimated by petitioner. However, in those instances no further depreciation was deducted with respect thereto and since the petitioner already had recovered its basis for the property, no additional deduction was taken when the property ceased to be used in the business. The petitioner's bookkeeping treatment of such property in nowise gave petitioner any added deduction. Respondent also contends petitioner has not shown the estimated useful life of the assets retired. The record contains an exhibit listing all *342 assets retired. This exhibit contains the year the asset was acquired, the year retired, the cost of the asset, the depreciation allowable and allowed in prior years, and the remaining cost to be depreciated. From this exhibit it is possible to compute the approximate estimated useful life of each asset. Since the rate of depreciation used by petitioner was based on the period during which it was expected that the property would be useful and productive in the petitioner's business, we think such period is to be regarded as the maximum expected life of the property. Depreciation deductions are based on estimates and for that reason can never be absolutely precise. . In view of what has been said above we hold that the petitioner is entitled to the deductions which it claimed for retirement losses for the years here involved. Decision will be entered under Rule 50. Footnotes
1. Presumably the finely ground stone.↩