**A. J. INDUSTRIES, INC.**

v.

**The UNITED STATES.**

**No. 114–64.**

United States Court of Claims.

Dec. 15, 1967.

Carl A. Stutsman, Jr., attorney of record, and Jack R. White, Los Angeles, Cal., for plaintiff, Hill, Farrer & Burrill, Los Angeles, Cal., of counsel.

Joseph Kovner, Washington, D. C., with whom was Asst. Atty. Gen. Mitchell Rogovin, for defendant, Philip R. Miller and Mitchell Samuelson, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

PER CURIAM:

This case was referred to Trial Commissioner Roald A. Hogenson with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in an opinion and report filed on March 1, 1967. Plaintiff has filed exceptions to the commissioner's findings and recommended conclusion of law and the case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court agrees with the commissioner's findings, opinion, and recommended conclusion of law, with the deletion of one finding, as hereinafter set forth, it hereby adopts the same, as modified, as the basis for its judgment in this case. Plaintiff is, therefore, not entitled to recover and the petition is dismissed.

OPINION OF COMMISSIONER *

HOGENSON, Commissioner:

In this action plaintiff seeks a refund of income taxes and assessed interest in the aggregate amount of $958,692.93 for the calendar years 1957, 1958, and 1959. Plaintiff's claim is founded upon an asserted loss deduction for the abandonment of the underground workings of its Alaska Juneau Gold Mine at Juneau, Alaska, allegedly sustained in 1958, which loss would create a net operating loss for that year, a carryback to 1957, a carryforward to 1959, and to later years not in issue here. The issues between the parties concern not only the amount of the deduction but primarily the allowability of the loss for 1958.[1] Since it is found that plaintiff's gold mine became valueless for tax deduction purposes in a year prior to 1958, the questions pertaining to the amount of the deduction need not be reached as no abandonment claim has been made by plaintiff for prior years. The part of plaintiff's claim herein which pertains to alleged entitlement to a deduction in the taxable year 1957 for an amount reimbursed by plaintiff to a stockholder for proxy fight expenses is no longer in dispute.

Section 165(a) of the Internal Revenue Code of 1954 permits the deduction of "any loss sustained *during the taxable year* and not compensated for by insurance or otherwise." [Emphasis supplied.] 26 U.S.C. § 165(a) (1952 ed., Supp. V, 1-6-58). The Treasury Regulations promulgated under the corresponding provision of the 1939 Code (section 23(f)) provide:[2]

(a) When, through some change in business conditions, the usefulness in the business of some or all of the assets is suddenly terminated, so that the taxpayer discontinues the business or discards such assets permanently from use in such business, he may claim as a loss for the year in which he takes such action the difference between the basis * * * and the salvage value of the property. This exception to the rule requiring a sale or other disposition of property in order to establish a loss requires proof of some unforeseen cause by reason of which the property has been prematurely discarded, as, for example, where an increase in the cost or change in the manufacture of any product makes it necessary to abandon such manufacture, to which special machinery is exclusively devoted, or where new legislation directly or indirectly makes the continued profitable use of the property impossible. * * * [Treas.Reg. 118, § 39.23(e)-3(a).] The Treasury Regulations (1954 Code) also provide:[3]

§ 1.165-2. Obsolescence of nondepreciable property.—(a) *Allowance of deduction.* A loss incurred in a business or in a transaction entered into for profit and arising from the sudden termination of the usefulness in such business transaction of any nondepreciable property, in a case where such business or transaction is discontinued or where such property is permanently discarded from use therein, shall be allowed as a deduction under

---

* The opinion, findings of fact, and recommended conclusion of law are submitted under the order of reference and Rule 57(a).

1. Defendant also contends that section 269 of the Internal Revenue Code of 1954 disallows the claimed deduction for tax avoidance purposes, but since it is concluded that the loss should have been claimed in prior years, it is not necessary to decide this issue.

2. The Regulations under section 165 were adopted on January 16, 1960, and under

section 7805(b) of the Internal Revenue Code of 1954 made retroactive to the taxable years beginning after December 31, 1953. 1960-1 Cum. Bull. 93. Treas. Reg. § 1.165-1(d) (4) allows taxpayers the option of applying either the Regulations under the 1939 Code or the 1954 Code to those losses occurring on or before January 16, 1960.

3. This Regulation is applicable to the tax years here in question since the 1954 Regulations do not specifically provide otherwise. 1960-1 Cum. Bull. 93.

section 165(a) for the taxable year in which the loss is actually sustained. For this purpose, the taxable year in which the loss is sustained is not necessarily the taxable year in which the overt act of abandonment, or the loss of title to the property occurs. [1960–1 Cum.Bull. 97]

Treas.Reg. § 1.167(a)–8(a) (4) provides a similar rule for the abandonment of depreciable property.

 In order for a loss to be deductible under the pertinent statutory section, it must be shown that the loss was actually sustained during the taxable year; that the loss became fixed by an identifiable event in such year; and that there was an intention on the part of the owner to abandon the property. The mere non-use of the property is not enough to constitute an act of abandonment. It is not essential that legal title to the property be lost. Whether the property actually did lose its useful value in a particular year, and whether the owner actually did abandon it as an asset during that year, are questions of fact to be determined from a consideration of all the surrounding facts and circumstances. The issue as to whether the loss was actually sustained calls for a practical, not a legal test, and the standard requires a flexible approach according to the circumstances of each case. The determination as to the year an asset loses its useful value or becomes worthless is a matter of sound business judgment, and that judgment should be given effect unless it appears from the facts that the decision as to the year of loss was unreasonable or unfair at the time the decision was made. Thus, the test is whether the plaintiff has established that under all the facts and circumstances and in the exercise of reasonable business prudence, it fairly determined that its investment in its mine was lost and should be abandoned as worthless in 1958. Lucas v. American Code Co., 280 U.S. 445, 50 S.Ct. 202, 74 L.Ed. 538 (1930); Boehm v. Commissioner of Internal Revenue, 326 U.S. 287, 66 S.Ct. 120, 90 L.Ed. 78 (1945); S. S. White Dental Mfg. Co. v. United States, 55 F.Supp. 117, 102 Ct.Cl. 115 (1944); Mine Hill & Schuylkill Haven R. R. Co. v. Smith, 184 F.2d 422 (3d Cir. 1950), cert. den. 340 U.S. 932, 71 S.Ct. 496, 95 L.Ed. 673 (1951); Rhodes v. Commissioner of Internal Revenue, 100 F.2d 966 (6th Cir. 1939); Denman v. Brumback, 58 F.2d 128 (6th Cir. 1932); Langdon-Warren Mines, Inc. v. Reynolds, 52 F.Supp. 512 (D.Minn.1943); Stanley Burke, 32 T.C. 775 (1959), aff'd Burke v. Com. of Internal Revenue, 9 Cir., 283 F.2d 487 (1960); Diamond Alkali Co., 13 T.C.M. 88 (1954); Empire District Electric Co., 4 T.C. 925 (1945); Rev.Rul. 54–581, 1954–2 Cum.Bull. 112; See generally 5 Mertens Law of Federal Income Taxation, sections 28.15, 28.17–19 (1963).

The defendant contends that the abandonment loss deduction claimed by plaintiff was properly disallowed for 1958 because (1) the Alaska Juneau Mine became worthless in a year prior to 1958; (2) no overt acts or identifiable event fixed 1958 as the date of the loss, and (3) no asset, tangible or intangible, was abandoned by plaintiff.

Plaintiff contends that it has never abandoned the Juneau mine as a piece of real estate but that instead it is seeking to deduct as a loss its investment in the capitalized costs of developing the underground workings of the mine. It claims that so long as it intended to preserve the underground workings of the mine, the capitalized development costs remained potentially valuable and a useful asset until it decided to abandon all hopes of making the mine productive again. Under this theory, plaintiff asserts that the adoption of the corporate resolution directing its officers to abandon the investment in the mine and to write it off its books and financial statements was sufficient to constitute an act of abandonment for tax purposes. Since the resolution of these issues is primarily a question of fact, it is necessary to set out the pertinent facts in detail.

Plaintiff, A. J. Industries, Inc. (formerly known as Alaska Juneau Gold Mining Company), from its incorporation in 1897 until 1944 was engaged in the busi-

ness of mining gold at Juneau, Alaska, and in California through subsidiaries. From 1897 through 1934 plaintiff acquired various patented mining claims, mill sites, water rights, and electrical power facilities in the vicinity of Juneau, Alaska, and operated these mining properties and facilities as a single mine which was known as the "Alaska Juneau Mine."

The Alaska Juneau Mine contained only low-grade ore, i. e., the gold content per ton of ore was small, so, in order to operate its mine at a profit, it was necessary to mine large quantities of ore at low cost. Plaintiff's method of mining was known as the "induced caving" method which required general development work underground (such as the digging of tunnels and shafts) and development work to prepare specific areas of the mine so that these work areas could be "caved-in" economically and safely. Those development costs which benefited the entire mine were identified and carried on plaintiff's books and records as "Mine Development Costs," while those development costs which benefited a specific area of the mine were identified as "Preparatory Mining Costs."

Plaintiff capitalized and amortized the preparatory and mine development costs over the period of time it estimated benefits would be received from the development work to which the costs related. The Internal Revenue Service allowed deductions, for amortization of both the Mine Development and Preparatory Mining Costs (plus deductions for cost depletion based upon the March 1, 1913 value of the ore body) through 1931. Thereafter, plaintiff was permitted deductions for amortization of the Preparatory Mining Costs until 1944, when the mine was shut down. After 1931 the deduction for the Mine Development Costs was disallowed by the Internal Revenue Service on the ground that such costs were recoverable only through percentage depletion which in 1931 replaced cost depletion. As of January 1, 1958, the unamortized balance in the Mine Development Account was $1,000,488; the unamortized balance

in the Preparatory Mining Account was $1,028,027. It is these unrecovered costs that plaintiff seeks to deduct as a loss for 1958.

In 1934 plaintiff acquired several hydroelectric power plants which supplied the large amount of electrical power needed to operate the mine. These power facilities became an integral part of plaintiff's mining operations. Plaintiff was able to sell excess power to the Alaska Electric Light and Power Company and has continued to sell power to this utility to the present time.

From 1928 until 1942, plaintiff operated the Juneau mine at a net profit and declared and paid dividends over this period of time in excess of $14 million. In 1934 the price of gold was fixed at $35 per ounce, and at that price plaintiff made a profit of approximately $10 per ounce of gold mined or 20 cents per ton of ore produced until 1943. Due to the wartime conditions and the rising costs of supplies and labor, this margin of profit was eliminated so that by 1943 plaintiff incurred net losses in excess of $350,000.

In May 1943, plaintiff's board of directors discussed the deteriorating economic conditions and passed a resolution authorizing the president to shut down the Juneau mining operations, if in his best judgment he considered it advisable. In 1944 the War Labor Board directed plaintiff to grant a 14 cent an hour retroactive pay raise to its employees. This order was the culminating factor in the decision to shut down the mine. Accordingly, plaintiff's president ordered the general manager at Juneau to immediately shut down all operations, except power production, to retain all powerplant operators, all key foremen and those men necessary to perform such maintenance work as necessary to preserve the mine, mill, equipment, and supplies in a standby condition so that mining operations could be resumed after a reasonable length of time. As a result of this order the mine was shut down, and the employee force of between 200 to 300 people was reduced to 44 men, of whom 10 had

duties solely with respect to the maintenance and inspection of the mine.

At the time of the shutdown plaintiff had a large stock of supplies and replacement parts at the mine. Its retained employees were engaged in various activities with respect to the mine and mill, consisting of inspection, repairs, cleanup, exploration, and preservation of equipment.

After the shutdown in 1944, the mine was never reopened, and through 1955 plaintiff did not engage in any substantial business or income-producing activity (other than power sales), thereby incurring net operating losses for each of those years.

In 1947 plaintiff began searching for new mining properties. It was approached on the possibility of using the main entrance tunnel (adit) of the mine as a water conduit in a pulp manufacturing venture, the water to be used not only in the manufacturing process but to generate additional electric power. In considering the pulp venture, plaintiff requested its general manager, Mr. Williams, to prepare a report on the condition of the mine and estimated value of the assets and the future prospects of reopening the mine. In his report Mr. Williams assumed that a competent crew could be obtained and based upon the economic conditions as they existed in 1948, he estimated that, based on 1940–41 costs to which 180 percent cost factor had been applied, the price of gold would have to be raised to around $60 per ounce in order to profitably operate the mine. Mr. Williams reported that in general the mine was in good condition; the mill was disorderly in appearance; its mill machinery was in good shape but extensive repairs were needed; the powerplants generally were in good condition; and that in order to fully reopen the mine, a large initial expense was required. The report concluded that in 1948 there was not an appreciable amount of ore remaining in the mine which would yield a profit but that with a "moderate amount of improvements in conditions for gold mining there is enough gold bearing rock

* * * to make the mine profitable once more."

In 1950 an option was granted to a Mr. Gray to negotiate a formal proposal for the use of some of plaintiff's assets in a pulp manufacturing venture, but this venture was never placed into operation.

By 1954 only two of the supervisory key men who had duties solely with respect to the mine were still in plaintiff's employ. By this time, mine maintenance had practically ceased. As the employee force had dwindled through the years, less maintenance was able to be accomplished, the rate of natural deterioration increased, drifts and cave-ins occurred which were not corrected or removed, and only the main entrance tunnel (adit) was kept clear to preserve access to the mine and machinery. Initially the lower levels of the mine were kept dry by pumping out the water which accumulated, but by 1952 long stretches of pipe were rusting out and the pumping equipment was in need of expensive repairs. In order to reduce the pumping costs and avoid the expensive repairs, it was decided that if the lower levels of the mine were flooded and thereafter allowed to fill with water, the cost of replacing the equipment could be avoided. It was also decided that the flooding would help preserve the untreated timbers in the lower part of the mine. Accordingly, the equipment in the lower part of the mine was removed and the lower levels were flooded. Thereafter, the water was allowed to accumulate naturally.

In 1956 a group of shareholders led by Charles J. Ver Halen, Jr., commenced a proxy fight to gain control of plaintiff. In their proxy solicitations the Ver Halen committee compaigned on the program to face up to the fact that it was impossible to mine ore at Juneau at a profit and that there was no prospect of mining gold at a profit in the foreseeable future. Ver Halen's committee further stated that plaintiff could only become successful by diversification.

The incumbent management in responding to the arguments and contentions of the Ver Halen committee restat-

ed their position of preserving the mine and mining plant for immediate resumption of operations when the price of gold was increased, which they believed would eventually occur.

The Ver Halen committee was successful in its proxy solicitations, and elected four men to plaintiff's seven-man board of directors. Upon assuming control, the new management directed Mr. Ver Halen to go to Juneau to inspect the assets of the company. In August or September of 1956, Mr. Ver Halen inspected the Juneau plant and reported back to the board that while he had found that some of the equipment had been preserved, there were tons of machinery, replacement parts, and scrap materials in a deteriorating condition. He recommended that the board embark as soon as possible on their acquisition plans to get someting to earn money for the company.

The two mining engineers on the board of directors (Messrs. Bradley and Crockett)[4] expressed their opinion that the mine could not be profitably operated in 1956 or in the foreseeable future and that the operation should be abandoned.

In October 1956 plaintiff purchased all the stock of the Reynolds Manufacturing Co., a Missouri corporation engaged in the business of manufacturing brake drums for trucks and other large motor vehicles and truck trailer tandems. The purchase price was $2,749,747 payable $1,500,000 down and the rest in installments.

When the new management assumed control of plaintiff, they discovered that the company's treasury had been depleted to around $100,000. In order to raise the money to finance the Reynolds acquisition, plaintiff attempted to borrow $50,000 on the company's assets from the banks in Juneau. The banks refused the loan stating that they didn't consider the assets had any value for security purposes. Plaintiff was able to raise ap-

proximately $1,100,000 by factoring the Reynolds' accounts receivable and Ver Halen agreed to loan plaintiff $200,000. These amounts, with the $100,000 in plaintiff's treasury, were still $100,000 short of the downpayment. In order to raise the remaining $100,000, plaintiff in late 1956 negotiated a contract with the Craine Steel Co., giving Craine an option on the salvage rights of all mining and mill equipment at Juneau. This contract was subsequently assigned to Machinery Center, Inc., a Utah corporation.

On January 28, 1957, plaintiff and Machinery Center entered into a written agreement appointing Machinery Center as plaintiff's exclusive sales agent on a best-efforts basis to remove and sell all of the mining equipment at Juneau with the exception of that used for power production. In this agreement plaintiff stated that it realized that the resumption of mining in Juneau was not economically feasible within the foreseeable future.

By the time these salvage contracts were made, the mining equipment had not been used for 13 years. Much of the equipment was obsolete and would have had to be replaced should mining operations ever be resumed. However, notwithstanding the obsolescence of the mining equipment, plaintiff decided to sell its unusable equipment to raise funds for its acquisition program rather than continue the prior management's policy of retaining idle assets until they could be used again for mining purposes.

In 1957 plaintiff's auditors recommended that the Juneau assets be appraised because they represented a substantial part of the net worth of the company. In September 1957, plaintiff authorized the employment of the General Appraisal Company to appraise the Juneau assets. In October 1957 the General Appraisal Company submitted its report stating the opinion that the fair market

4. Mr. Bradley was a member of plaintiff's board from 1944 to 1959 and had recommended to the board against reopening the mine since 1952. Mr. Crockett became a member of the board in 1956.

He repeatedly told the board the mine was non-economic; it could never be made a commercial operation; and it should be abandoned.

value of the mine, mill, and ore bodies was $50,000 as of October 27, 1957.[5] The equipment in the mine was not included in this appraisal since it was being dismantled and disposed of. The report stated that the patented lands and the improvements covering the mine, mill, and ore bodies were of no present economic value except in a limited market and on long range speculation. The report also examined the possibilities of an increase in the price of gold and projected a possible price of $73 per ounce by 1982, which was considered to be below the price necessary to operate the Juneau properties at a profit.

In 1957 plaintiff hired an engineer consultant, Mr. Wilbur H. Hanson, to inspect the mine underground workings and installed equipment, mill machinery and related equipment and powerplant, to identify and relate such property with that shown on the financial statements and to submit a report as to their physical condition. In his report dated January 10, 1958, Hanson stated that the mine was in extremely poor condition, but that all mine and mill motors, generators, and the underground hoist had been protected and could be placed in operation on short notice. He expressed the opinion that gold mining could not be put on a paying basis even if the price of gold were doubled, and under conditions as they then existed, the remaining ore had no value.

In October 1958, plaintiff acquired substantially all of the outstanding stock of the Fletcher Aviation Corporation whose principal business was the manufacture and sale of external fuel tanks for military aircraft. Until January 1961, Fletcher was operated as a subsidiary when it was dissolved and its assets transferred to plaintiff.

The matter of permanently abandoning mining at Juneau was considered by plaintiff's new management at various times after taking office in 1956, but no definitive action was taken.

The major factor plaintiff's new management considered in refusing to abandon the Juneau properties was the fact that plaintiff's stock was traded on the New York Stock Exchange.

Plaintiff's management was concerned that if the mining assets, which accounted for approximately 78 percent of its total asset value,[6] were suddenly removed from its financial statement or were substantially written down, it would lose its stock listing. Thus, one of the principal reasons for the Fletcher acquisition was to strengthen its net asset position.

On December 16, 1958, plaintiff's board of directors adopted a formal resolution directing its officers to abandon as worthless the investment in the Mine Development Costs and Preparatory Mining Costs. As of December 31, 1958, these assets were written off plaintiff's books.

In 1959, plaintiff went through a quasi-reorganization to readjust the value of the remainder of its mining properties as of March 31, 1957, to reflect their then estimated fair market value. This reevaluation was made by reducing the assets on the books by $11,130,936, eliminating the deficit in plaintiff's earned surplus in the amount of $5,475,260 and at the same time reducing its capital surplus in the amount of $16,606,196.

After plaintiff charged off its investment in the Juneau mining properties in 1958, it nevertheless thereafter paid real property taxes thereon. It also applied

---

5. In its annual report to stockholders for the year ending December 31, 1956, the mining properties and related equipment and supplies were carried at $15,349,842.

6. In the Annual Report for the year ending December 31, 1957, the Juneau mining properties, not including the power facilities or general office equipment were carried at $15,171,351 (excluding reserves for depletion, depreciation, amortization, and obsolescence). The total net assets, including the Reynolds Manufacturing division, were carried at $19,439,290 (excluding reserves for depletion, depreciation, amortization, and obsolescence). Thus, the mining properties accounted for 78.04% of plaintiff's net assets.

for and received annual licenses for several years thereafter to engage in lode mining, but only so that it could sell to the Government the gold dust salvaged during its program of cleanup and dismantling of equipment.

It is still possible that the Juneau mine could be reopened and mined, provided there were a sufficient increase in the price of gold, which some experts feel will eventually occur. However, in order for plaintiff to reopen the Juneau mine, a tremendous initial capital investment would be required. For example, the three mining experts who testified, estimated that by 1958 the price of gold would have to be increased to between $105 and $120 per ounce in order to operate the Juneau mine at a profit. Furthermore, an initial capital investment of from two to three million dollars would be required.

Plaintiff also had two subsidiaries who owned gold mines in California with ore estimated to be three to four times the value of the Juneau ore. Thus, in view of the higher costs in Alaska, and the low-grade ore, an increase in the price of gold would more likely bring about a reactivation of gold mines in California before the Juneau mine was reopened. Therefore, for all practical purposes, the Juneau property was worthless as a mine by 1958, if not before.

Before plaintiff can claim its deduction for the abandonment loss of the Mine Development and Preparatory Mining Costs in 1958, it must be shown that the loss was "sustained during the taxable year." This requirement has been emphasized by this court in Minneapolis, St. Paul & Sault Ste. Marie R. R. v. United States, 164 Ct.Cl. 226, 239–241 (1964), which involved the determination of what year certain obligations became worthless. This court noted that prior to 1942 the test of worthlessness was a "subjective" rather than an "objective" test and that a deduction would be allowed in the year in which "there was a bona fide ascertainment by the taxpayer of the worthlessness of a debt irrespective of whether its worthlessness could have

been ascertained prior to the year when it was discovered, so long as the taxpayer exercised reasonable judgment." The court stated that the subjective test was rejected by the Supreme Court in Boehm v. Commissioner of Internal Revenue, 326 U.S. 287, 292, 66 S.Ct. 120, 90 L.Ed. 78 (1945), and that a loss to be deductible must have been sustained *in fact* during the taxable year. The court further stated:

* * * We interpret this as meaning that the taxpayer now not only has the burden of proving that the debt had some intrinsic value at the beginning of the year it allegedly became worthless and that it became worthless in the taxable year in question, but also that the taxpayer must show that throughout the entire life of the debt, the evidence reasonably available to him pointed out that it was possessed of some value and had not become wholly worthless. * * *

It is obvious that there is no precise test for determining worthlessness within the taxable year and neither the statutory enactment, its regulations, nor the decisions attempt such an all-inclusive definition. From the numerous decisions, we are taught that a determination of whether or not a debt becomes worthless in a particular year must be confined to the fact of the particular case. Furthermore, it is often impossible to select a single factor or identifiable event" which clearly establishes the time at which a debt becomes worthless and thus deductible. More often it is a series of events which in the aggregate present a picture establishing that the debt in question has become worthless. Such a decision of necessity requires a practical approach, not a legal test. * * * It must be flexible in nature, varying according to the circumstances of each particular case, so that whatever inferences a court might draw from a particular fact in another case are not binding on the examining court, although the same fact may be present. The Tax Court has aptly said that

"worthlessness is not determined by an inflexible formula or slide rule calculation, but upon the exercise of sound business judgment." * * * In making such a determination the taxpayer must follow a rule of reason, avoiding alike the Scyllian role of the "incorrigible optimist" and the Charybdian character of the "stygian pessimist." * * * To be deductible, a debt need not be proven worthless beyond all peradventure, since a bare hope that something might be recovered in the future constitutes no sound reason for postponing the time for taking a deduction. * * * The taxpayer is not required to postpone his entitlement to a deduction in the expectancy of uncertain future events nor is he called to wait until some turn of the wheel of fortune may bring the debtor into affluence.

It appears that the taxpayer must strike a middle course between optimism and pessimism and determine debts to be worthless in the exercise of sound business judgment based upon as complete information as is reasonably obtainable. [Citations omitted.]

Plaintiff seeks to distinguish the worthless debt and security cases from the abandonment loss deduction, arguing that there is a distinction between "worthlessness" and "loss of useful value." Plaintiff says that the "worthlessness" of a security or debt can be determined by objective standards while the determination of "loss of usefulness" of an asset to a business must involve some discretion on the part of the managers of the business. Thus, plaintiff says that "so long as the determination [of the loss of usefulness of an asset] is made in the exercise of reasonable business judgment, it must rest entirely with management."

To support its position plaintiff relies primarily upon two cases. In S. S. White Dental Mfg. Co. v. United States, 55 F.Supp. 117, 102 Ct.Cl. 115 (1944), the taxpayer operated three manufacturing plants. In 1936 it decided to move one plant to a new location. In May 1937 the operations at the old plant were moved to the new location and the old plant was abandoned. Two months later the old plant was sold and the taxpayer claimed an abandonment loss deduction. The court, with two judges dissenting, considered the sale to be immaterial and in construing the applicable regulations (identical to the 1939 Regulation quoted at the beginning of this opinion) held that "the words 'the usefulness in the business of some or all of the capital assets is * * * terminated' must mean terminated in whole or in such part that, in the opinion of the managers of the business, good management calls for their being discarded." (55 F.Supp. at 121, 102 Ct.Cl. at 123)

In Hazeltine Corp. v. United States, 170 F.Supp. 615, 145 Ct.Cl. 138 (1959), taxpayer in 1944 wrote off three trademarks as a loss. They had not been used since 1930 because they pertained to obsolete radio receivers which taxpayer had ceased to manufacture. The deduction was allowed for 1944 because it was found that the taxpayer had the right to retain the trademarks on the possibility that it might be feasible to utilize them again in connection with similar products, that the intent to abandon the trademarks was not formulated until 1944, and the identifiable act of abandonment occurred in that year.

But neither *S. S. White* nor *Hazeltine* is authority for plaintiff's theory that the determination of which taxable year an asset became "worthless" or "loses its useful value" is *solely* within the discretion of the business judgment of management. It has long since been settled that an "abandonment loss is deductible only in the taxable year in which it is sustained," Rev.Rul. 54–581, 1954–2 Cum.Bull. 112, and a taxpayer may not postpone the taking of an abandonment loss deduction, which has actually been sustained, to a year in which the deduction will result in a larger savings of tax. Superior Coal Co. v. Commissioner of Internal Revenue, 2 T.C.M. 984 (1943), aff'd 145 F.2d 597 (7th Cir. 1944), cert. denied 324 U.S. 864, 65 S.Ct. 913, 89 L.Ed. 1420 (1945).

In Mine Hill & Schuylkill Haven R. R. v. Smith, 184 F.2d 422 (3d Cir. 1950), cert. denied 340 U.S. 932, 71 S.Ct. 496, 95 L.Ed. 673 (1951), the taxpayer had leased certain railroad lines to the Reading Company under a 999-year lease. The lease required the Reading Company to maintain the lines in good condition. In 1941 and 1943 the taxpayer and the Reading Company jointly filed applications with the Interstate Commerce Commission for permission to abandon certain of the branch lines which had not been operated or maintained for some 12 years. The court, affirming the Tax Court's denial of the abandonment loss deduction claimed for the years (1942 and 1943), in which the ICC had granted the applications, found on the facts that the losses (taxpayer's investment in lines less salvage value) had not been sustained in fact during the taxable years (1942 and 1943) but that the lines were actually abandoned in years preceding the ICC action.

Also, in C–O Two Fire Equipment Co. v. Commissioner of Internal Revenue, 219 F.2d 57 (3d Cir. 1955) the court again emphasized the requirement that the loss must in fact be sustained in the year the deduction is claimed. Taxpayer in January of 1946 began to manufacture an instrument called a "Phonette." By November 1946 the venture had proved to be an absolute failure, yet taxpayer attempted modifications of the "Phonette" which also proved to be unsuccessful. In March 1947, taxpayer ceased all attempts to market the "Phonette" and claimed its loss deduction for 1946 on the theory that its inventory of phonettes had become obsolete in that year. The court found that the loss was actually sustained in 1946 even though the optimistic taxpayer had subsequently made futile attempts to keep the market alive. These futile attempts were destined for failure and the evidence showed that the taxpayer did not realize the futility of his efforts until 1947.

Plaintiff contends that its Juneau mine did not lose its usefulness until 1958 because its investment in the underground workings, i. e., the tunnels, raises, etc., still had a potential value so long as it believed that economic conditions for the gold mining industry would improve. Years before 1958, plaintiff's mining experts believed that there was no reasonable prospect that plaintiff could ever reopen the mine. The evidence in this case certainly warrants the conclusion that plaintiff was an "incorrigible optimist," if one discounts entirely that the real reason for delay was to obtain tax advantages.

The Juneau mine was shut down in 1944, after two successive years of net operating losses. Plaintiff, believing that after the war the economic conditions would improve, maintained the mine on a standby condition for eventual reopening when economic conditions improved. In 1948, in considering whether to use its Juneau assets for other ventures, it was informed that the price of gold would have to be increased to $60 per ounce in order to mine again. After 1948, the economic conditions for gold mining steadily worsened so that by 1958 gold would have had to be increased to between $105 and $120 per ounce to even consider reopening the mine. After 1948, plaintiff expended substantially less and less funds on maintaining its mine in a standby condition, indicating that its hopes were running out. By 1954 only two of its experienced key men remained in plaintiff's employ; its machinery and equipment were becoming worn and obsolete; the natural deterioration of the mine increased; and drifts and cave-ins occurred which were not corrected because its dwindling personnel could no longer keep up with the increased work. The lower levels of the mine were flooded, not only for preservative measures, but also because the pumping equipment had to be replaced. By 1953, it appeared as though the reopening of the mine was highly unlikely, so plaintiff began looking for new business.

By 1956, plaintiff's stockholders were dissatisfied with the policies of the management and elected a new slate of directors who promised "to face up to the fact

that there is no prospect of mining gold at a profit from our present properties in the foreseeable future." After Mr. Ver Halen, the leader of the insurgent group, had returned from his inspection of the Juneau mine, he realized the mine was inoperable, uneconomic, and unlikely to be operated in the foreseeable future. He recommended that the board immediately begin its acquisition program. The two mining engineers on the new board expressed their opinion that the mine was noneconomic. The Juneau banks refused to loan over $50,000 on the mining assets.

As further evidence that the mine had no value as a mine, the General Appraisal Company stated in 1957 that the patented lands, mine improvements, mill and ore bodies were of no present economic value. The 1958 Hanson report in effect added nothing to the evidence already compiled and before the board.

■ Plaintiff contends that its Juneau mine did not become worthless prior to 1958 because the mining assets, including the capitalized development costs, were carried on its books and financial statements, giving it the appearance of financial strength; and that if it had written off these assets prior to 1958, or prior to the Fletcher acquisition, it would have lost its stock exchange listing. The propriety of plaintiff's accounting methods are not in issue here, and undue weight should not be accorded them in determining whether for tax deduction purposes the Juneau mine became worthless or lost its useful value as a mine in 1958 and not in prior years. However, plaintiff's prolonged overstatement of the value of its assets to meet its stock exchange problem, coupled with the obvious tax advantages which accrued, explain eloquently the delay to 1958 in the write-off of the Juneau mine investments. It cannot be ignored that the resolution of plaintiff's board of directors (upon which plaintiff bases its abandonment) was not passed until December 16, 1958, near the end of the first taxable year in which plaintiff made a net operating profit after 14 successive years of net operating loss.

■ The facts and circumstances in evidence clearly establish that plaintiff's Juneau mine became worthless prior to 1958, and plaintiff's petition should be dismissed.

COLLINS, Judge, took no part in the decision of this case.